# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

vs.                                                                    No. CR 06-1833 MCA

**WINGROVE EDWARD MICHAEL**,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the following motions filed by Defendant Wingrove Edward Michael on February 15, 2007: (1) the *Motion in Limine Concerning Defendant's Proposed Testimony at Suppression Hearing* [Doc. 33]; (2) the *Motion for Discovery* [Doc. 34], (3) *Defendant's Second Motion to Suppress and Request for Evidentiary Hearing* [Doc. 36], and (4) the *Motion Requesting Franks Hearing* [Doc. 37]. The Court held an evidentiary hearing on these motions in Albuquerque, New Mexico, on May 2, 2007, at which Defendant and counsel were present.[1] Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being fully advised in the premises, the Court denies *Defendant's Second*

---

[1]At the hearing on May 2, 2007, the Court also heard evidence and proffers regarding the following motions which will be the subject of a separate *Memorandum Opinion and Order* filed at a later date: (1) Defendant's *Motion to Preserve Evidence* [Doc. 24] filed on November 17, 2006; (2) Defendant's *Motion to Dismiss, and/or, in the Alternative, Motion to Suppress* [Doc. 35] filed on February 15, 2007; and *Defendant's Motion to Quash Subpoena of Don Wright* [Doc. 63] filed on April 30, 2007.

*Motion to Suppress* for the reasons set forth below.  In light of the Court's ruling on the *Second Motion to Suppress* and the developments at the hearing on May 2, 2007, the Court also denies Defendant's *Motion for Discovery*, *Request for Evidentiary Hearing*, *Motion in Limine Concerning Defendant's Proposed Testimony at Suppression Hearing*, and *Motion Requesting Franks Hearing*.

## I.    <u>FINDINGS OF FACT</u>

### A.    <u>The Safety Inspection at the Port of Entry</u>

1.    The State of New Mexico has enacted a regulatory scheme that generally requires commercial carriers entering or leaving New Mexico to stop at its ports of entry and authorizes state employees assigned to those ports of entry to inspect commercial vehicles and their documentation to determine whether the vehicles, drivers, and cargo are in compliance with relevant state and federal laws regarding public safety, health, and welfare. <u>See generally</u> N.M. Stat. Ann. § 65-5-1 (Michie 2003).

2.    The discretion of the state personnel staffing these permanent ports of entry is limited by New Mexico statutes and regulations which define the place, scope, and duration of the safety-related inspections they may perform under the State's regulatory scheme for commercial carriers.

3.    In accordance with this regulatory scheme, the Motor Transportation Division (MTD) of the New Mexico Department of Public Safety (NMDPS) operates a permanent port of entry on Interstate 40 near Gallup, New Mexico, and New Mexico's western border with Arizona.

4.     The Gallup port of entry has well-defined primary and secondary inspection areas, known respectively as the "credential booth" and the "inspection bays."

5.     The credential booth, or primary inspection area, consists of a small building and driveway that is not suited to conducting a complete inspection concerning all categories of information covered by the State's regulatory scheme; the tasks that may be performed at the credential booth are, for practical reasons, limited to reviewing documentation, conversing with the vehicle's occupants, and visually inspecting the vehicle's exterior for a brief period for screening purposes.

6.     The inspection bays, or secondary inspection area, consist of a large and well-lit indoor garage with doors at both ends that is equipped for conducting a more thorough inspection concerning all areas covered by the State's regulatory scheme, including the vehicle's interior and cargo.

7.     Depending on considerations such as the amount of traffic, time of day, weather, and staffing levels, it is not always practical for officers at the credential booth to direct every commercial carrier to an inspection bay for a more thorough safety inspection.

8.     The officers staffing the credential booth may account for these practical considerations by exercising their discretion in selecting which vehicles to refer to the inspection bay.

9.     The officers' selection of vehicles to refer to the inspection bay is, however, focused on identifying those commercial carriers which are likely to present a safety hazard or otherwise be in violation of the State's regulatory scheme.

10.     In this regard, one of the factors that officers at the port of entry routinely use in identifying vehicles to refer to the inspection bay is whether the vehicle bears a current CVSA inspection decal.

11.     A current CVSA inspection decal signifies that the vehicle has recently passed a safety inspection using criteria that are similar, if not identical, to those employed in the State's regulatory scheme.

12.     When practical considerations permit, officers at the credential booth routinely refer commercial carriers to the inspection bay when they lack a current CVSA inspection decal.

13.     MTD Officer Hermilo Lucero was on duty in the credential booth at the Gallup port of entry at approximately 11:10 p.m. on or about August 9, 2006.

14.     At that time, commercial carrier traffic entering the port of entry was very light, and it was dark and rainy outdoors.

15.     These conditions were suitable for referring a vehicle to the inspection bay and not suitable for getting a good look at vehicles from the credential booth.

16.     Shortly after 11:10 p.m., Defendant drove to the location of the credential booth at the Gallup port of entry in a white Peterbilt tractor with a sleeper compartment pulling a 53-foot enclosed and refrigerated trailer.

17.     Upon Defendant's arrival at the credential booth, Officer Lucero proceeded to ask him a standard series of questions about his travel plans and cargo.

18.     Defendant responded that he had picked up a load of tools in Las Vegas, Nevada, earlier that day and was transporting them to Atlanta, Georgia.

19.     Officer Lucero then asked to see Defendant's logbook and noted that his tractor-trailer rig was not displaying a current CVSA  inspection decal.

20.     Defendant produced his logbook and, upon reviewing it, Officer Lucero noted that Defendant had more "off duty" time, as well as a more unusual series of travel routes, than the officer typically had seen in other commercial trucking logbooks.

21.     In particular, the logbook reports that Defendant spent five days from July 28, 2006, to August 1, 2006, traveling from La Porte, Texas to Las Vegas, Nevada by way of San Antonio, Saragosa, Anthony, Tucson, Eloy, Yuma, and Kingman.  The logbook reports that he then left Las Vegas for Salt Lake City, Utah, on the afternoon of August 3, 2006, and spent all of August 4, 2006, sleeping or off-duty in Salt Lake City, only to return to Las Vegas on August 5, 2006.  The logbook entries for August 5, 2006, through August 8, 2006, indicate that Defendant spent the better part of three days off-duty in Las Vegas before beginning  an eastbound trip from Las Vegas across the State of Arizona.  It was during the last eastbound trip from Las Vegas reported in his logbook that Defendant appeared at the Gallup port of entry in the late evening hours of August 9, 2006.  [Ex. 2a.]

22.     The explanation Defendant later gave Officer Lucero for his extended off-duty time in Las Vegas was that he had a court hearing there to contest a traffic citation regarding the number of license plates on his tractor.

23.     Based on the lack of a CVSA sticker on Defendant's vehicle as well as Defendant's unusual logbook entries--and without asking any personal questions about Defendant's race or national origin--Officer Lucero directed Defendant to drive his tractor-trailer rig into the inspection bay at the port of entry in order to conduct a "Level 2 safety inspection."

24.     Defendant complied with this request and drove his tractor-trailer into the inspection bay, allowing Officer Lucero to commence the Level 2 safety inspection at approximately 11:15 p.m.

25.     The parameters of a Level 2 safety inspection correspond to the categories of information listed in the State's regulatory scheme and include both a review of paperwork (including the driver's license, medical card, logbook, vehicle registration, bill of lading, and permits) and an inspection of the vehicle itself (including the interior of the cab and sleeper compartment as well as the interior of the trailer and its cargo).

26.     During the Level 2 inspection of Defendant's tractor-trailer that Office Lucero performed at the Gallup port of entry in this case, Defendant identified himself as the owner of both the tractor and trailer, and he produced a bill of lading that was unusual in several respects. [Ex. 1a.]

27.     First of all, Defendant's bill of lading was handwritten, and Officer Lucero credibly testified based on his training and experience that it was unusual to see handwritten bills of lading because, in this day and age, most bills of lading consist of computer-generated forms.

28.     Second, Defendant's bill of lading lists the trailer's cargo as consisting of only three boxes of tools; this fact was unusual not only because it left the majority of the trailer empty, but also because it did not make sense to carry tools in a refrigerated trailer.

29.     Finally, Defendant's bill of lading lists the same zip code for both the shipper's address in Las Vegas and the address of the company paying the freight charges in Seattle, and the telephone number for the shipper in Las Vegas is the same as the telephone number for the consignee in Atlanta.

30.     After reviewing Defendant's documentation, Officer Lucero continued the Level 2 safety inspection by, among other things, checking the tractor's sleeping compartment to ensure that the sleeper berth met regulatory requirements; while doing so he saw a radar detector in plain view in an open trash can.

31.     Recognizing that regulations do not permit radar detectors in commercial vehicles of this type, Officer Lucero seized the radar detector and later issued Defendant a citation for it.

32.     Continuing with the next step in the Level 2 safety inspection, Officer Lucero directed Defendant to unlock the trailer doors and break the seal so that the officer could check to make sure the trailer's cargo matched the bill of lading and that the cargo was properly secured in the trailer.

33.     After Defendant unlocked and opened the trailer doors, Officer Lucero could see that most of the space in the rear half of the trailer was empty, and toward the front of the trailer there were a number of wooden crates and pallets.

34.     Officer Lucero entered the trailer and identified three square wooden crates approximately four to five feet in length, width, and height; Officer Lucero could not readily open the crates because their tops were screwed down.

35.     In front of the crates, Officer Lucero observed a number of wooden pallets stacked on top of one another adjacent to what appeared to be the front wall of the trailer.

36.     While working within the parameters of his Level 2 safety inspection of the trailer's cargo, Officer Lucero saw, in plain view, several features on the front wall of the trailer which led him to believe that it was a false wall designed to mimic the appearance of the trailer's real front wall and thereby conceal a hidden compartment at the front of the trailer.

37.     Although the false front wall was shaped to look and function like the trailer's real front wall, some of the details of the finish on the front wall did not match the rest of the trailer and did not appear to be "factory" equipment; in particular, there was an excess of fresh silicone sealant running from the seams or joints where the front wall attached to the trailer's roof and side walls.

38.     In addition, Officer Lucero noticed that the trailer floor appeared to go past the front wall, and the trailer was missing the drain holes that, based on his training and experience, the officer typically saw at the front corners of a refrigerated trailer.

39.     These characteristics of the front wall of Defendant's trailer were consistent with the features of false front walls concealing hidden compartments that Officer Lucero

had observed in his prior experience inspecting trailers at the port of entry; on prior occasions Officer Lucero had found contraband secreted behind such false front walls.

40.     In order to confirm his suspicions about the presence of a hidden compartment, Officer Lucero asked one of the other MTD officers at the port of entry, Oscar Destea, to enter the trailer and look at the front wall area; Officer Destea observed the same features previously identified by Officer Lucero and agreed with his assessment that the trailer contained a false front wall.

41.     While Officer Destea was looking at the front wall area in the trailer, Officer Lucero questioned Defendant about whether he had done any recent repair work on the trailer; Defendant responded that he had to get the air chute replaced because it had damaged an $85,000 load of strawberries that he had to pay for.

42.     The trailer's air chute consists of one or more large sheets of plastic running along the trailer's ceiling for the purpose of distributing refrigerated air from its source at the refrigeration unit mounted on the outside front of the trailer; consequently, the alleged repair work to the air chute would not explain the presence of fresh silicone sealant and other discrepancies on those portions of the trailer's front wall that did not intersect with the air chute or the refrigeration unit's ductwork.

43.     To further confirm his suspicion that Defendant's trailer contained a false front wall concealing a hidden compartment, Officer Lucero next used an electric laser measuring device to compare the interior length of Defendant's trailer with its exterior length.

-9-

44.     This comparison revealed that the exterior of Defendant's trailer measured 53 feet in length from the rear door to the front wall, while the interior of the trailer from the rear door to the false front wall measured only 49 feet, 11 inches in length, leaving approximately three feet of trailer space unaccounted for.

45.     Notwithstanding his suspicions about the trailer, Officer Lucero proceeded to complete his Level 2 safety inspection, close and seal the trailer doors, open the exit door to the inspection bay, issue Defendant a citation for the radar detector in his tractor, return all his documents to him, and advise him that he was free to go at approximately 11:55 p.m. on August 9, 2006.

46.     This procedure accords with Officer Lucero's training pursuant to New Mexico's regulatory scheme and is used to mark the boundary between the completion of the Level 2 safety inspection and any consensual encounter or law-enforcement investigation that follows.

47.     At the time the Level 2 safety inspection was completed at approximately 11:55 p.m. on August 9, 2006, Officer Lucero's observation of the features and measurements suggesting a false front wall in the trailer, combined with the irregularities in the logbook and bill of lading, the presence of a radar detector in the tractor, the absence of a full load in the trailer, and the anomaly of carrying three crates identified as "tools" in a refrigerated trailer, gave the officers at the port of entry probable cause to seize the trailer,

conduct a more thorough search of its contents for the presence of contraband, and detain Defendant pending the outcome of that search.[2]

### B.     The Investigative Detention and Canine Inspection

48.     After completing the Level 2 safety inspection in this case, Officer Lucero invited Defendant to engage in a consensual encounter wherein the officer would ask additional questions about the presence of illegal cargo and attempt to conduct an additional search of the tractor and trailer.

49.     Although Defendant initially may have assented to this consensual encounter for a few moments, he quickly withdrew his consent and indicated his desire to leave when Officer Lucero asked for permission to perform a canine inspection of the tractor and trailer.

50.     When declining Officer Lucero's request for a canine inspection, Defendant's level of nervousness appeared to increase; in this regard, Officer Lucero observed that Defendant "stiffened up," would not make eye contact, and stated that he was allergic to dogs.

51.     When Defendant terminated his very brief consensual encounter with Officer Lucero at the conclusion of the Level 2 safety inspection, Officer Lucero placed Defendant under investigative detention for law-enforcement purposes, conducted a brief pat-down

---

[2]As will be discussed in further detail in the analysis that follows, I do not consider or credit any testimony that one or more of the officers could smell the odor of marijuana during their initial inspection of the trailer; consequently, such testimony is not used in determining whether the officers had probable cause to prolong the seizure and conduct a more thorough search.

search of his person, and proceeded to conduct a canine inspection around the exterior of the tractor and trailer without Defendant's consent.

52.     The scope of Officer Lucero's employment as an MTD officer encompasses canine handling for the purpose of detecting the odors of controlled substances and concealed humans.

53.     Both Officer Lucero and his dog, Brenda, are trained and certified through the United States Border Patrol's National Canine Facility near El Paso, Texas.

54.     To become certified by the National Canine Facility, a dog and handler team must perform 14 searches in a variety of controlled environments and receive a score for each search.

55.     Upon completion of the certification process, a team's scores are reported in a certification letter.

56.     In this case, Officer Lucero and Canine Brenda successfully completed the National Canine Facility's training and testing on March 6, 2006, with a total certification score of 2.66, which is in the average range for teams that pass the certification tests.

57.     Accordingly, Officer Lucero and Canine Brenda were certified in the detection of concealed humans and the odors of cocaine, marijuana, heroin, methamphetamine, and their derivatives according to the National Canine Facility's standards for a twelve-month period beginning on March 6, 2006.

58.     The parties have not elicited any credible testimony or other evidence calling into question the validity or reliability of this certification for the period between March 6,

2006, and the time of the canine inspection of the exterior of Defendant's trailer during the midnight hour between August 9, 2006, and August 10, 2006.

59.     During the canine inspection of the exterior of Defendant's trailer, Canine Brenda reliably alerted and indicated near the driver's side front portion of the trailer.

60.     The dog's reliable alerting behavior further confirmed Officer Lucero's suspicions that the trailer was carrying contraband.

61.     Accordingly, Officer Lucero read Defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and continued to detain Defendant pending the outcome of a more thorough search of the trailer.

62.     Defendant invoked his right to counsel at that point and did not respond to further questions; however, the statements he previously made during the Level 2 safety inspection were not taken in violation of his Miranda rights.

### C.    The Search Warrant

63.     Although the MTD officers already had probable cause to search Defendant's trailer for the presence of controlled substances under the "automobile exception" to the warrant requirement stated in the Fourth Amendment to the United States Constitution, Officer Lucero nevertheless delayed the search until a warrant could be obtained in order to comply with Article II, Section 10 of the New Mexico Constitution, which does not recognize the "automobile exception" to the warrant requirement. See State v. Gomez, 1997-NMSC-006, ¶ 44, 122 N.M. 777, 932 P.2d 1.

64.    Accordingly, the only reason for prolonging Defendant's investigative detention pending the outcome of the trailer search was the MTD officers' good-faith effort to comply with the more stringent requirements of state law with respect to search warrants.

65.    After the dog alerted during the canine inspection and Defendant was advised of his Miranda rights, Officer Lucero proceeded to write out a search-warrant affidavit and seek approval for a search warrant from both a representative of the local district attorney's office and a state judge.

66.    Because the events described above unfolded around the midnight hour, Officer Lucero encountered difficulty in locating the necessary officials to approve his application for a search warrant; he had to make several telephone calls before finding an assistant district attorney and a state district court judge who were available to review and approve the search warrant, and such approval required Officer Lucero to travel to and from the Gallup port of entry and the judge's residence.

67.    The process of applying for and obtaining the search warrant took approximately two and one-half hours, until about 2:30 a.m.

68.    Upon obtaining the search warrant and returning to the inspection bay at the Gallup port of entry, Officer Lucero spent another fifteen minutes or so, until approximately 2:45 a.m., serving Defendant with a copy of the search warrant, making the necessary preparations to record the execution of the search warrant from the video camera mounted on his vehicle, and obtaining the equipment needed to open and photograph the crates and false wall located in the trailer.

69.     With the assistance of Officer Destea and other MTD officers, Officer Lucero's first task upon re-opening the trailer doors was to position the crates where they could be safely opened and then unscrew the boards affixed to the top of the crates using a power drill.

70.     Upon completing this process, Officer Lucero and Officer Destea opened the top of the crates in the trailer and observed large bundles which, based on their training and experience, they knew to be consistent with the packaging of bulk marijuana for illegal distribution.

71.     Officer Lucero and Officer Destea also observed that there had been some effort to render the crates airtight by placing styrofoam insulation panels on all of the crates' interior surfaces and sealing the seams or joints on those panels with a silicone sealant.

72.     After discovering the bundles of what appeared to be marijuana in the crates, Officer Lucero and Officer Destea next turned to the task of breaching the false front wall of the trailer.

73.     This task required the officers to first move the stack of wooden pallets away from the false front wall of the trailer, and then remove a black plastic covering from the center portion of that wall.

74.     Behind the black plastic covering, the officers found a trap door in the false front wall which was secured by some type of electronic locking device.

75.     The officers proceeded to pry open the trap door in the false front wall, revealing a hidden compartment at the front of the trailer, which was empty.

76.     As the officers did not exceed the lawful parameters of a Level 2 safety inspection during the initial search and seizure of Defendant and his tractor-trailer rig, and the officers used the information obtained within the lawful parameters of that safety inspection to develop probable cause for the additional search and seizure resulting in the discovery of the marijuana bundles, the exclusionary rule does not apply to any of the evidence produced by Defendant or found in the tractor-trailer rig (including the crates of marijuana, the false front wall concealing the hidden compartment, the bill of lading, the logbook, or the statements Defendant made during the Level 2 safety inspection that preceded his arrest).

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.     Defendant's Fourth Amendment Standing

Before addressing Defendant's motion to suppress, I must first resolve the preliminary issue of whether he has Fourth Amendment standing[3]  to challenge the actions of the MTD officers at the port of entry.  The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures.  Defendant has Fourth Amendment standing to challenge the seizure of his person regardless of whether he had any property interest in the vehicle he was occupying.  See generally United States v. Olivares-Rangel, 458 F.3d 1104, 1112 (10th Cir. 2006); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).

---

[3]The Court uses the term "standing" to refer to a defendant's reasonable expectation of privacy in the item or area that is the subject of the search or seizure he is challenging.

In order to challenge the search of a vehicle, however, Defendant bears the additional burden of establishing that he has an interest in the vehicle that is protected by the Fourth Amendment.  See United States v. Arango, 912 F.2d 441, 444 (10th Cir.1990); accord United States v. Rascon, 922 F.2d 584, 587 (10th Cir. 1990).  The existence of a cognizable Fourth Amendment right to be free from unreasonable searches and seizures of a motor vehicle depends on two factors:  whether the individual in question has exhibited a subjective expectation of privacy in the vehicle, and whether society recognizes that subjective expectation as reasonable.  See Rascon, 922 F.2d at 586.  Although formal documentation (such as a certificate of title or registration form) is not necessarily required in order to establish proof of ownership or legitimate possession, mere possession or control of the vehicle alone is not sufficient to satisfy this test.  See United States v. Jefferson, 925 F.2d 1242, 1249-50 (10th Cir. 1991); Arango, 912 F.2d at 445.

The Tenth Circuit examined the requirements for establishing Fourth Amendment standing to challenge the search of a trailer in United States v. Kopp, 45 F.3d 1450, 1452 (10th Cir. 1995), and United States v. Abreu, 935 F.2d 1130, 1133 (10th Cir. 1991).  Under these requirements, the Defendant's privacy interest in the vehicle he was driving must be considered separately from his privacy interest in the trailer to which that vehicle was attached.  See Kopp, 45 F.3d at 1452 (citing Abreu, 935 F.2d at 1133).  Even if the Defendant is the owner of the truck, its physical connection to the trailer alone is not sufficient to establish his legitimate expectation of privacy in the trailer.  See id.  And where the truck's owner fails to present evidence that he owned, rented, or controlled access to the

trailer, or that he had some type of agency relationship with the trailer's owner (through his employment or otherwise) that authorized him to use the trailer and control access to it, the Tenth Circuit has held that a truck owner lacks Fourth Amendment standing to challenge a search of the attached trailer.  See id.; Abreu, 935 F.2d at 1133.

In this case, Officer Lucero testified that Defendant claimed ownership of both the tractor and the trailer, and that Defendant possessed the keys to open the locks on the trailer doors.  The Government introduced no evidence to rebut Defendant's claim of ownership and, following Officer Lucero's testimony, the Government conceded that Defendant has Fourth Amendment standing to challenge the search of the trailer.  Based on this concession, and defense counsel's reliance upon it during the presentation of evidence that followed, I conclude that Defendant has Fourth Amendment standing to challenge the search of the trailer in this instance.  See Olivares-Rangel, 458 F.3d at 1106 n.1; cf. United States v. Kennedy, 131 F.3d 1371, 1379 n.9 (10th Cir. 1997) (deciding the issue on other grounds where neither party raised the question of Fourth Amendment standing to challenge the reliability of a canine inspection).

### B.      The Safety Inspection at the Port of Entry

Once Defendant establishes or obtains concessions as to his standing, the burden shifts to the Government to show that the initial warrantless search and seizure at the port of entry were reasonable, i.e., that they fit under one or more of the recognized exceptions to the Fourth Amendment's warrant requirement.  See United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993).  The Government easily meets this burden with respect to the initial

encounter at the port of entry's credential booth and the Level 2 safety inspection that followed in the inspection bay.

The Tenth Circuit has previously upheld the State of New Mexico's regulatory scheme for conducting warrantless inspections of the commercial trucking industry at its ports of entry pursuant to the three-part test articulated in New York v. Burger, 482 U.S. 691, 703 (1987).  See United States v. Vasquez-Castillo, 258 F.3d 1207, 1210 (10ᵗʰ Cir. 2001). In the present case, as in Vasquez-Castillo, the State of New Mexico has a substantial interest in regulating commercial carriers to protect public safety on the highways, and warrantless safety inspections of commercial tractor-trailer rigs at the State's ports of entry are necessary to further the State's regulatory scheme governing commercial carriers.  See id. at 1210-11. The State's regulatory scheme sufficiently informs commercial carriers that their property will be subject to periodic inspections undertaken for safety purposes and that MTD officers stationed at the State's permanent ports of entry are authorized to perform such safety inspections.  See id. at 1211-12.

In this case, Defendant focuses his challenge on the final test that warrantless inspection regimes governing a closely regulated industry must pass in order to comply with the Fourth Amendment, i.e., the requirement that the State's regulatory scheme "must limit the discretion of inspectors in time, place, and scope."  Id. at 1211.  In particular, Defendant contends that while staffing the Gallup port of entry's credential booth, Officer Lucero has "unfettered discretion" to decide which vehicles to send to the inspection bays for more thorough inspections.  Defendant also challenges the duration of the search and seizure at the

inspection bay in this instance, contending that the regulatory scheme fails to place adequate time limits on the officers' safety inspection.

Although Defendant's questions during cross-examination of Officer Lucero succeeded in prompting the officer to admit or agree that he has "unfettered discretion" to select which vehicles to refer from the credential booth to the inspection bays, I do not credit that particular aspect of the officer's testimony, nor do I accept the proposition that the officer's discretion in screening vehicles at the credential booth is so unlimited as to violate the Fourth Amendment. The purpose of screening vehicles at the credential booth and referring some of them to the inspection bays is to ascertain the particular categories of information that commercial carriers are required to produce under New Mexico's regulatory scheme, and thereby identify carriers in violation of that regulatory scheme. In this regard, there are certain objective and readily identifiable factors, such as the lack of a CVSA inspection decal, that the officers routinely use in determining which vehicles to refer to the inspection bay.

Taken in context, Officer Lucero's testimony does not suggest that he performs his work at the credential booth for some other purpose that falls outside the State's regulatory scheme, or that he relies on wholly arbitrary or invidious criteria (such as  a driver's race or national origin) to select which vehicles to refer to the inspection bays. While in many instances an officer may exercise discretion in favor of allowing vehicles to pass through the credential booth without referring them to the inspection bay, his or her exercise of that discretion is nevertheless governed by practical considerations such as the amount of traffic,

time of day, weather, and staffing levels at the port of entry.  Because these practical considerations fluctuate from moment to moment, it would be unrealistic to expect the officers staffing the credential booth at the port of entry to stick to a hard-and-fast rule, such as referring every third vehicle to the inspection bays.

Such a hard-and-fast rule would, like the time limitation discussed in Vasquez-Castillo, "'render the entire inspection scheme unworkable and meaningless.'" Id. at 1212 (quoting United States v. Dominguez-Prieto, 923 F.2d 464, 470 (6th Cir. 1991)). Commercial carriers pass through the State's ports of entry twenty-four hours a day, and the officers staffing the credential booth must have the authority to regulate the number and timing of vehicles referred to the inspection bays as the ever-fluctuating conditions in an uncontrolled environment dictate.  See Dominguez-Prieto, 923 F.2d at 469-70; cf. United States v. Sanders, 937 F.2d 1495, 1499-1500 (10th Cir. 1991) (citing United States v. Martinez-Fuerte, 428 U.S. 543, 563 (1976), for the proposition that "Supreme Court teachings instruct[] that no particularized reason need exist to justify referring a motorist to a secondary inspection area" at a fixed Border Patrol checkpoint).

I also disagree with Defendant's contention that the officers at the port of entry retain unlimited discretion to prolong the duration of a safety inspection for as long as they desire. The State's regulatory scheme defines the categories of information that the officers are permitted to review during their safety inspections at the port of entry, and Officer Lucero credibly identified a set of objective elements defining each level of search and under what circumstances it is performed.  It follows that the permissible duration of a safety inspection

-21-

at the port of entry is limited to the amount of time that is reasonably necessary to complete these defined elements or tasks that comprise a particular level of inspection.  Once the officer has performed each of those elements, the type of safety inspection permitted by the State's regulatory scheme for commercial carriers is at an end, and any further encounter with the driver or vehicle must proceed on some other grounds, such as the driver's voluntary consent or a criminal investigation based on probable cause.  See, e.g., Vasquez-Castillo, 258 F.3d at 1212 (analyzing whether information gleaned from a safety inspection at a port of entry can be used to establish probable cause for an additional search).

In this case, Officer Lucero credibly explained the standard elements of a Level 2 safety inspection and how he applied those elements to the search of Defendant's property at the port of entry.  After completing those elements, Officer Lucero ended the safety inspection pursuant to the State's regulatory scheme for commercial carriers and returned all of Defendant's property to him.  The officer also issued Defendant a citation for possessing a radar detector, which fell within the scope of the items the officer was authorized to look for in the cab and sleeping compartment of the tractor during the Level 2 safety inspection. In all respects, the officer's safety inspection fell within constitutionally permissible parameters, and he was therefore authorized to use the information he gathered during that inspection for purposes of establishing probable cause for a subsequent criminal investigation.   See id. at 1212.

Defendant faults Officer Lucero for delaying the canine inspection of the trailer's exterior until after he completed the Level 2 safety inspection.  In this regard, it is not clear

that the Fourth Amendment would have precluded Officer Lucero, or another canine handler, from deploying a drug-detection dog around the vehicle's exterior during the period when Defendant and his property already were lawfully detained at the port of entry for purposes of a safety inspection or document review.  For example, our Supreme Court has permitted canine inspections of a vehicle's exterior to occur during lawful traffic stops as long as they do not prolong the duration of the stop.  See Illinois v. Caballes, 543 U.S. 405, 409-10 (2005).

Ultimately, however, Officer Lucero was not required to conduct the canine inspection at the same time as the Level 2 safety inspection, because Defendant was lawfully detained pending completion of that safety inspection pursuant to the State's regulatory scheme, and the information the officers obtained during the safety inspection gave them probable cause to further detain him when they completed that inspection.  Moreover, moving the canine inspection to an earlier point in the sequence of events at the port of entry would not have benefitted Defendant even if it was lawful for the officer to do so. Regardless of the sequence in which it was performed, the canine inspection would have given the officers alternative grounds to find probable cause to prolong the seizure and continue the search as soon as the dog alerted.   Thus, I find that any delay in performing the canine inspection, or sequencing the canine inspection in relation to the Level 2 safety inspection, was not unreasonable under the Fourth Amendment and does not provide a basis for invoking the exclusionary rule.

C.      **The Investigative Detention and Canine Inspection**

Defendant next contends that there is no legal justification for Officer Lucero's decision to continue questioning him and perform a canine inspection of the trailer's exterior, because the safety inspection was over and he did not voluntarily consent to remain at the port of entry any longer.  In this regard, Defendant correctly asserts that notwithstanding Officer Lucero's efforts to create a consensual encounter at the conclusion of the safety inspection, Defendant quickly withdrew his consent to prolong that encounter when the officer introduced the idea of performing a canine inspection for the presence of marijuana or other controlled substances.

While the canine inspection of the tractor-trailer's exterior surfaces was not itself a "search" within the meaning of the Fourth Amendment, see United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir. 1993), Defendant and his property were nevertheless seized for an additional period of time while Officer Lucero performed the canine inspection and obtained a search warrant.  In order to comply with the Fourth Amendment, this prolonged seizure requires a showing of probable cause based on the totality of the information the officers gleaned during the safety inspection which preceded it.  See Vasquez-Castillo, 258 F.3d at 1212.

Courts have held that the term "probable cause" is not self-defining, but requires an inquiry based upon common sense informed by the totality of the circumstances found in the particular case.  See United States v. Mathis, 357 F.3d 1200, 1205 (10th Cir. 2004) (citing

-24-

Illinois v. Gates, 462 U.S. 213 (1983)).  In determining whether probable cause exists, a judge's task

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the [record] . . . before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Artez, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting Gates, 462 U.S. at 238).

In examining the totality of the circumstances in this case, I have elected not to credit or consider the testimony that one or more of the officers could smell the odor of marijuana in the trailer during the initial safety inspection that preceded the canine inspection, or at any time before the crates were opened.  In a separate motion, Defendant has asserted that the Government's subsequent destruction of all but a few samples of the marijuana evidence in this case precluded him from developing expert testimony which could potentially serve to rebut the officers' testimony about whether they could smell the odor of marijuana inside the trailer during that time frame.  [Doc. 35.]  Thus, in order to prevent the Government's destruction of the marijuana from having any prejudicial impact on Defendant's hypothesis that human beings could not smell the odor of marijuana in the trailer, I will assume the truth of that hypothesis and exclude the odor of marijuana from the totality of the circumstances used in determining probable cause.

That assumption does not change the result of the Court's Fourth Amendment inquiry in this case, because regardless of the officers' ability to smell the odor of marijuana, they

could still establish probable cause based on Officer Lucero's independent prior discovery of evidence concerning the false front wall during the initial safety inspection of the trailer's interior.

The Tenth Circuit has held that "in certain instances evidence of a hidden compartment can *alone* give rise to probable cause to search a vehicle for contraband." United States v. Stephenson, 452 F.3d 1173, 1177 (10th Cir. 2006) (citing United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004)). In order to establish probable cause based on evidence of a hidden compartment in this case, the Government needs to demonstrate (1) "the likelihood that there really is a hidden compartment" in the trailer, and (2) the likelihood that such a hidden compartment in the trailer "would, in the circumstances, be secreting contraband." Jurado-Vallejo, 380 F.3d at 1238.

With regard to the first of these requirements, Officer Lucero observed several indicia of a false front wall on the trailer, including the absence of front drain holes in the floor, the appearance of the trailer floor running past the front wall, and the fresh silicone sealant running from the seams or joints where the front wall attached to the trailer's roof and side walls. He then confirmed his suspicions by measuring the length of the trailer inside and out, which revealed a difference of about three feet between the exterior front wall and the false front wall on the interior. Like the officer in Stephenson, 452 F.3d at 1177-78, Officer Lucero has found hidden compartments in similar locations in the past, and in those prior instances the hidden compartments were used to conceal contraband. (Indeed, the configuration of the trailer in this instance resembles that described in other reported

-26-

marijuana-smuggling cases such as <u>Vasquez-Castillo</u>, 258 F.3d at 1209-10.)  Thus, based on the information known to him at the time he completed the safety inspection of Defendant's trailer (not including the odor of marijuana), there was a strong likelihood that the trailer really did contain a false front wall concealing a hidden compartment.

Based on that same set of information, there was also a strong likelihood that the hidden compartment in Defendant's trailer would, in the circumstances, be secreting contraband.  <u>See</u> <u>Jurado-Vallejo</u>, 380 F.3d at 1238-39.  In this regard, it is important to note that the false front wall at issue here was specifically shaped to mimic the appearance of the trailer's real front wall.  This structural feature could not be confused with a simple partition or divider that might be used to create a separate storage compartment within the trailer for legitimate purposes.

The officer's suspicions about the contents of the hidden compartment were corroborated by the irregularities in the logbook and bill of lading, which were not consistent with the typical practices of the commercial trucking industry and could be used to further mask or dissimulate the true purpose of Defendant's trip and the nature of his cargo.  <u>See</u> <u>Vasquez-Castillo</u>, 258 F.3d at 1213.  These documents provided no obvious explanation for why Defendant would be making a cross-country trip carrying only three crates labeled as "tools" in a large, refrigerated trailer.  In addition, the officer's discovery of a radar detector in the cab or sleeping compartment suggested a heightened interest in detecting and avoiding scrutiny by law-enforcement officers.

Finally, the fact that the officers later discovered the hidden compartment to be empty in this instance does not retroactively deprive the officers of probable cause to detain the Defendant and his property for the period of time reasonably necessary to gain access to the compartment.  In this regard, I note that Defendant did not disclose the presence of a hidden compartment when questioned about recent repair work on the trailer, and the small trap door which provided the only means of gaining entry to the hidden compartment was locked and hidden from view behind a stack of wooden pallets and a black plastic covering at the time of the safety inspection, thereby preventing the officers from readily ascertaining whether or not the hidden compartment was empty during that brief inspection.

In this situation, "[p]robable cause requires 'only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" Stephenson, 452 F.3d at 1178 (quoting Gates, 462 U.S. at 243 n.13).  Based on the information developed during the initial safety inspection (not including the odor of marijuana), there was a substantial chance that the trailer's false front wall was being used to further some criminal activity, and the officers at the port of entry had probable cause to detain Defendant while they continued their efforts to discover the trailer's true contents.  See id.

> **D.**     **The Search Warrant and Defendant's Request for a *Franks* Hearing**

Before  discovering the true contents of the three crates and the hidden compartment, the officers took the additional steps of performing a canine inspection and obtaining a search warrant after the result of the canine inspection was known to them.  Under federal law, it was unnecessary for the officers to take the extra step of obtaining the search warrant

because the "automobile exception" to the Fourth Amendment's warrant requirement allows for a search of a vehicle's interior based on probable cause alone for as long as the vehicle lawfully remains in police custody; there is no need for a warrant or a showing of exigent circumstances.  See generally Florida v. Myers, 466 U.S. 380, 382 (1984);  Chambers v. Maroney, 399 U.S. 42, 51-52 (1970).  In addition, the canine inspection was not needed to establish probable cause, because the officers already had probable cause based on the evidence of a hidden compartment in the trailer and other surrounding circumstances such as the irregularities in the logbook and bill of lading, as well as the anomaly of carrying only three crates labeled as "tools" in a large, refrigerated trailer.[4]

Nevertheless, I will briefly address Defendant's challenges to the validity of the search warrant and the reliability of the canine inspection in order to ensure a complete record of all of the alternative grounds on which the Government has justified the officers' actions in this case.  As Defendant's challenges to the search warrant are intertwined with his request for an evidentiary hearing under the procedural framework articulated in Franks v. Delaware, 438 U.S. 154, 171-72 (1978), I also will address Defendant's *Motion Requesting Franks Hearing* together with the remaining discussion of his *Second Motion to Suppress*.

---

[4]In stating that these actions were not necessary for purposes of the Court's Fourth Amendment inquiry, the Court does not find any fault with the officers' performance in this case. Because the officers did not know at the time whether the case would be prosecuted in state or federal court, it is understandable that they would wish to be as thorough as possible in order to comply with the requirements of both state and federal law.

The state judge's decision to issue a search warrant in this case is entitled to "great deference" by a reviewing court.  <u>Gates</u>, 462 U.S. at 236.  Accordingly, a reviewing court "need only ask whether, under the totality of the circumstances presented in the affidavit, the [issuing] judge had a 'substantial basis' for determining that probable cause existed."  <u>Artez</u>, 389 F.3d at 1111 (quoting <u>Gates</u>, 462 U.S. at 238-39).

Under this standard of review, an evidentiary hearing to test the veracity of a search warrant affidavit is not required unless the defendant alleges deliberate falsehood or reckless disregard for the truth on the part of the affiant, and those allegations are accompanied by a sufficient offer of proof.  <u>See id.</u> at 1116.  "Allegations of negligence or innocent mistake" are insufficient to warrant an evidentiary hearing under <u>Franks</u>.  <u>See id.</u>

To support an allegation regarding the affiant's deliberate falsehood or reckless disregard for the truth, a defendant should provide affidavits of witnesses or satisfactorily explain their absence.  Such affidavits or explanations should include a statement of supporting reasons, not merely conclusory denials.  In addition, a defendant seeking an evidentiary hearing must show that, after the challenged portions of the affidavit are stricken, the remaining content of the affidavit is not sufficient to support a finding of probable cause. <u>See id.</u>; <u>Franks</u>, 438 U.S. at 171.

In this case, Officer Lucero's affidavit contains a description of why he believed Defendant's trailer contained a false front wall concealing a hidden compartment, as well as an account of how Canine Brenda reliably alerted to the presence of controlled substances

during her inspection of the trailer's exterior.  Either of these portions of the affidavit provide a substantial basis for issuing the warrant.

Insofar as the search warrant relies on the canine inspection, the general rule is that once a dog reliably alerts to the presence of narcotics, police officers have probable cause to search the location of the dog's alert for narcotics.  See United States v. Pinedo-Montoya, 966 F.2d 591, 594 (10th Cir. 1992); United States v. Morales-Zamora, 914 F.2d 200, 205 (10th Cir. 1990).  In order to establish the reliability of the dog's alert in this context, it is generally sufficient for the search warrant affidavit to state "that the dog is trained and certified to detect narcotics."  United States v. Kennedy, 131 F.3d 1371, 1376-77 (10th Cir. 1997).  Our Tenth Circuit has declined "to encumber the affidavit process by requiring affiants to include a complete history of a drug dog's reliability."  Id.

This general rule derives from

> "the fact that the dog is trained and annually certified to perform a physical skill. When the annual certification process involves actual field testing and grading of the canine's drug-detection skills . . . the canine's reliability is sufficient for a probable cause determination absent some circumstance that justifies a more complete examination of the canine's skill and performance."

Kennedy, 131 F.3d at 1378 (quoting United States v. Wood, 915 F. Supp. 1126, 1136 n.2 (D. Kan. 1996), rev'd on other grounds, 106 F.3d 942 (10th Cir. 1997)).  In other words, probable cause can be reasonably inferred from a dog alert where "the dog was certified on the day in question" and "properly alerted to the presence of contraband."  United States v. Gonzalez-Acosta, 989 F.2d 384, 389 (10th Cir. 1993).

To the extent that there remained any questions about whether the search warrant affidavit met these minimum requirements in this case, Defendant was afforded the opportunity to ask those questions during his cross-examination of the dog's handler, Officer Lucero, at the evidentiary hearing on May 2, 2007. Officer Lucero's testimony at the hearing is sufficient to satisfy the criteria for reliability set forth in <u>Kennedy</u> and to clarify any ambiguities or shortcomings in the search-warrant affidavit with respect to the dog's training and certification.

After hearing this testimony, I find that Officer Lucero did not place any false or misleading information about the reliability of the dog alert in the search warrant affidavit he prepared in this case. The officer's testimony at the hearing only serves to confirm that the dog properly alerted to Defendant's trailer. Both dog and handler were adequately trained and certified at the time of this canine inspection. The parties have identified no irregularities or shortcomings in the history or performance of this dog and handler team that would call their reliability into question or warrant further inquiry in this case.

Given the reliability of the dog alert, the officers need not rely on their own sense of smell to establish probable cause. While I recognize that Defendant is claiming his proposed odor expert's ability to present testimony on this subject is hampered by the Government's subsequent destruction of all but a few samples of the marijuana, this claim is of no consequence with respect to the search warrant, because there would still be enough information in Officer Lucero's affidavit to establish probable cause even if all references to an officer smelling the odor of marijuana inside the trailer were deleted from it.

The same conclusion applies to the portions of the search warrant affidavit that Defendant cites as raising an inconsistency in Officer Lucero's account of his efforts to invite a consensual encounter after concluding the Level 2 safety inspection.  As with the dog alert, Defendant's counsel had the opportunity to cross-examine Officer Lucero about this perceived inconsistency at the hearing on May 2, 2007, and whether Defendant did or did not voluntarily consent to step down from his tractor-trailer rig at the conclusion of the Level 2 safety inspection does not undermine the basis for finding probable cause to issue the search warrant.  Even if the perceived inconsistency was omitted from the search warrant affidavit or corrected to accord with Defendant's assertion that he had no consensual encounter with Officer Lucero, the affidavit still establishes probable cause to issue the search warrant and detain Defendant based on the evidence of a hidden compartment, the result of the canine inspection, and the surrounding circumstances such as the logbook irregularities.  See Kennedy, 131 F.3d at 1378; Stephenson, 452 F.3d at 1177-78.

As the officers did not exceed the lawful parameters of a Level 2 safety inspection during the initial search and seizure of Defendant and his tractor-trailer rig, and the officers used the information obtained within the lawful parameters of that safety inspection to develop probable cause for the additional search and seizure resulting in the discovery of the marijuana bundles, the exclusionary rule does not apply to any of the evidence produced by Defendant or found in the tractor-trailer rig (including the crates of marijuana, the false front wall concealing the hidden compartment, the bill of lading, the logbook, or the statements Defendant made during the Level 2 safety inspection that preceded his arrest).  For all of the

-33-

above reasons, the Court denies Defendant's *Second Motion to Suppress*, as well as his

*Motion Requesting Franks Hearing*.

      E.      **Defendant's Motion for Discovery**

In order to further explore the issues raised in his motion to suppress, Defendant also

has filed a discovery motion requesting that the Government be ordered to disclose the

following categories of information:

> (a) any and all training materials relating to the training and/or certification of Brenda and Officer Lucero as a handler of Brenda and any other drug detection canines, including, but not limited to, any and all texts, treatises, memorandum or other writings or police training materials reflecting the factors utilized to justify the opinion of Officer Lucero that Brenda had positively alerted to the presence of narcotics on August 9, 2006;

> (b) any and all reports, memorandum, notes and video or audio recordings relating to any training of both Brenda and Officer Lucero, either individually or as a team, between any certifications within the last five years, and especially after the MTD certification of March, 2006;

> (c) any and all records pertaining to the certification training and testing Brenda and Officer Lucero participated in with the MTD in March, 2006, both of the program generally and specifically relating to the team of Brenda and Officer Lucero, including, but not limited to, the scoring system used by MTD to determine accuracy, reliability and certification; a description of the program and tests given to the team; and any records indicating the teams performance on each individual test;

> (d) any and all records pertaining to the use of Brenda by "State and local municipalities" as referred to by Officer Lucero in the Incident Report; and

> (d) any and all records pertaining to any claims of mishandling or mismanagement of any canines by Officer Lucero, including, but not limited to, the canine Brenda.

[Doc. 34, at 4-5.]  The Court takes judicial notice that the same or very similar categories of documents are now being routinely requested in criminal cases in this district when a canine inspection is at issue.  See, e.g., United States v. Sanchez, No. CR 07-117 MCA (D.N.M. filed Feb. 26, 2007); United States v. Morales, No. CR 06-2607 MCA, Doc. 17 (D.N.M. filed Jan. 24, 2007); United States v. Forbes, No. CR 06-1578 RB, Doc. 20 (D.N.M. filed Jan. 8, 2007); United States v. Polston, No. CR 04-1850 JCH, Doc. 29 (D.N.M. filed Dec. 2, 2004).

The rationale for rejecting these requests has been well-stated in other cases.  See, e.g., Kennedy, 131 F.3d at 1378; Gonzalez-Acosta, 989 F.2d at 389; Morales, No. 06-2607 MCA, supra, Doc. 49; Forbes, No. CR 06-1578 RB, supra, Doc. 39.  I therefore take judicial notice of the record in other recent cases in this district where the same type of motion was denied.  See Green v. Nottingham, 90 F.3d 415, 418 (10th Cir. 1996) (federal courts may take notice of judicial proceedings in other courts if they have a direct relation to matters at issue).  In several of these recent cases, a representative of the National Canine Facility has testified in great detail as to the rigorous standards to be met and the detailed scoring system to be applied before a dog and its handler will be certified through that agency's program.  See, e.g., Sanchez, No. CR 07-117 MCA (transcript of proceedings held on Mar. 28, 2007); Morales, No. CR 06-2607 MCA (transcript of proceedings held on Mar. 1, 2007).

According to Officer Lucero's testimony and the certification documents presented in the case at bar, he and Canine Brenda successfully completed the National Canine Facility's training and certification process, and they obtained an average certification score.  Officer Lucero also discussed his history with the dog, including the times during which he

or the dog were undergoing medical treatment, and the officer's testimony on this subject did not reveal any problems at the time of the canine inspection at issue here, which resulted in the discovery of a large load of marijuana.

For the purpose of establishing probable cause for a search and seizure during Officer Lucero's field operations at the Gallup port of entry, his testimony outlined above, together with a review of the search-warrant affidavit and the certification documents for the dog and handler team, are sufficient to determine the reliability of the canine inspection. Through such testimony and review of the documents already produced to him, Defendant was provided with a fair opportunity to make a threshold showing, for purposes of a discovery motion or a request for a <u>Franks</u> hearing, that the dog and handler were not certified at the time of the canine inspection at issue, or that there is a specific reason to question the validity or reliability of the certification. <u>See</u> <u>Gonzalez-Acosta</u>, 989 F.2d at 389. When, as here, neither the witnesses' testimony nor the existing documents establish such a threshold showing, no legitimate purpose is served by requiring the Government to produce additional supporting documentation (through a discovery order or a <u>Franks</u> hearing) in response to a blanket request for all records relating in any way to the training or past performance of a dog and its handler. Therefore, Defendant's discovery motion is denied.

### F.    **Motion in Limine Concerning Defendant's Proposed Testimony**

Before the hearing on May 2, 2007, Defendant filed a motion in limine seeking to preclude or limit the Government's cross-examination in the event that he elected to testify in his own defense with regard to the pending motions which the Court heard on that date.

At the hearing, however, the Government conceded the issue of Defendant's Fourth Amendment standing to challenge the search and seizure of the trailer in which the crates of marijuana were found, and therefore Defendant was made aware that it would not be necessary for him to testify in order to establish his standing.

Defendant's counsel also was provided with several opportunities to seek clarification regarding his motion in limine before deciding whether to testify.  In this regard, the Court was not in a position to rule on the permissible scope of the Government's cross-examination until notified of the intended scope of Defendant's direct examination, at which time Defendant's objections to his cross-examination could be addressed on a question-by-question basis.

Ultimately, Defendant elected not to testify at the hearing on May 2, 2007, and he was never forced into the dilemma of having to choose between the exercise of his Fourth Amendment rights and the waiver of his Fifth Amendment privilege against self-incrimination, as articulated in Simmons v. United States, 390 U.S. 377, 394 (1968). Therefore, Defendant's motion in limine is denied as moot.

## G.      **Defendant's Selective Enforcement Claim**

In his motion papers, Defendant alludes to the possibility that one or more officers at the Gallup port of entry singled him out for greater scrutiny at the inspection bay based on his race (Black or African American) or what they perceived as his national origin (Jamaican).  The evidence presented at the hearing on May 2, 2007, does not lend any credence to this allusion.

Claims of selective enforcement based on presumptively impermissible factors such as race or national origin generally do not implicate the Fourth Amendment but instead require another constitutional basis, such as the Fourteenth Amendment's Equal Protection Clause. See Whren v. United States, 517 U.S. 806, 813 (1996). The essential elements of a selective enforcement claim under the Equal Protection Clause include both discriminatory effect and discriminatory intent. See United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001); Poole v. County of Otero, 271 F.3d 955, 958 (10th Cir. 2001), abrogated in part on other grounds by Hartman v. Moore, 126 S. Ct. 1695, 1701 (2006). To prove discriminatory effect, Defendant must make a credible showing that a similarly-situated individual "could have been prosecuted for the offense for which the defendant was charged, but was not." James, 257 F.3d at 1179; accord Poole, 271 F.3d at 958. As to discriminatory intent, "'the defendant must prove that the government's selection of him for prosecution was invidious or in bad faith and was based on impermissible considerations such as'" his race or the desire to prevent his exercise of constitutional rights. Poole, 271 F.3d at 958-59 (quoting United States v. Furman, 31 F.3d 1034, 1037 (10th Cir. 1994)). To the extent that Defendant is challenging the officer's initial decision to single him out for more a more detailed safety inspection, rather than the subsequent decision to prosecute, similar considerations would still apply.

In this instance, Defendant's cursory allusions to racial profiling or selective enforcement do not provide the necessary factual basis or legal argument to show that the essential elements of a selective enforcement claim have been satisfied. Defendant has not

elicited any meaningful testimony in this case concerning the number of African-American or Jamaican individuals the officers have detained and searched at the port of entry or the number of suspects of other races or national origins that the officers could have lawfully detained and searched but did not. Simply providing anecdotal information from other cases which cannot be tested through cross-examination in this case does not suffice to show selective enforcement. Thus, Defendant has not shown that he is entitled to suppression of the evidence in this case based on a selective enforcement claim. See Poole, 271 F.3d at 959; James, 257 F.3d at 1181.

While such a selective enforcement claim presents a question of law for the Court to decide when it is timely raised before trial, see United States v. Bryant, 5 F.3d 474, 476 (10th Cir. 1993), the Court's ruling on this issue does not necessarily answer the separate question of whether or for what purpose counsel may inquire about Defendant's race or national origin, or any alleged racial bias of a witness or a member of the jury panel, during jury selection or at trial. As stated at the hearing on May 2, 2007, I defer ruling on such evidentiary or trial-related issues pending the completion of briefing on the Government's motion in limine. [Doc. 58.]

## III.  **CONCLUSION**

For the foregoing reasons, the Court denies *Defendant's Second Motion to Suppress*. In light of the Court's ruling on the *Second Motion to Suppress* and the developments at the hearing on May 2, 2007, the Court also denies Defendant's *Motion for Discovery*, *Request*

*for Evidentiary Hearing*, *Motion in Limine Concerning Defendant's Proposed Testimony at Suppression Hearing*, and *Motion Requesting Franks Hearing*.

**IT IS, THEREFORE, ORDERED** that *Defendant's Second Motion to Suppress and Request for Evidentiary Hearing* [Doc. 36] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's *Motion Requesting Franks Hearing* [Doc. 37] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's *Motion for Discovery* [Doc. 34] is **DENIED**.

**IT IS FURTHER ORDERED** that the *Motion in Limine Concerning Defendant's Proposed Testimony at Suppression Hearing* [Doc. 33] is **DENIED AS MOOT**.

**SO ORDERED** this 22nd day of June, 2007, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

-40-