# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

      vs.                                              No. CR 06-1833 MCA

**WINGROVE EDWARD MICHAEL**,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the following motions filed by Defendant Wingrove Edward Michael: (1) the *Motion to Preserve Evidence* [Doc. 24] filed on November 17, 2006; (2) the *Motion to Dismiss, and/or, in the Alternative, Motion to Suppress* [Doc. 35] filed on February 15, 2007; and (3) the *Motion to Quash Subpoena of Don Wright* [Doc. 63] filed on April 30, 2007. The Court held evidentiary hearings on these motions in Albuquerque, New Mexico, on May 2, 2007, and on August 1, 2007, at which Defendant and counsel were present.[1] Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being fully advised in the premises, the Court denies Defendant's *Motion to Dismiss* but grants in part the alternative relief requested in his *Motion to Suppress* for the reasons set

---

[1]The Court also heard evidence on other pending motions which are the subject of the Court's prior *Memorandum Opinion and Order* [Doc. 72] filed on June 22, 2007.

forth below.  Defendant's *Motion to Preserve Evidence* and *Motion to Quash Subpoena of Don Wright* are denied as moot in light of the events that arose after the filing of these motions.

## I.   <u>BACKGROUND</u>

In the early morning hours of August 10, 2006, officers of the State of New Mexico's Department of Public Safety, Motor Transportation Division, seized a load of approximately 1,700 pounds of marijuana from a 53-foot refrigerated trailer following a safety inspection at the Gallup port of entry near New Mexico's western border with Arizona.  The details of this seizure and the search that preceded it are described more fully in the Court's *Memorandum Opinion and Order* [Doc. 72] filed on June 22, 2007.

At the time of its seizure, the marijuana was bundled in contact paper, and the bundles were contained in three large wooden crates approximately four to five feet in length, width, and height.  The wooden crates had styrofoam insulation panels on their interior surfaces, and the seams or joints on the sides and bottoms of those panels had been sealed with a silicone sealant.  The tops of the crates were fastened down with wood screws.

These conditions changed when the officers opened and searched the crates.  First, the officers unscrewed and removed the top panels from each of the crates.  Next, the officers removed the crates from the trailer.  Finally, the officers removed each of the marijuana bundles from each crate and stacked them in the port of entry's inspection bay.

The marijuana bundles and crates remained at the port of entry until picked up and moved to the Albuquerque offices of the Drug Enforcement Administration (DEA) a few

days later, on August 14, 2007. Once in the DEA's custody, the marijuana bundles were unloaded, stacked, photographed, and weighed. Government agents checked the packaging materials for fingerprint evidence but the analysis subsequently conducted by the FBI did not reveal any fingerprints (or other biometric information) on these materials that could be used to incriminate the Defendant in this case.

DEA Agent Hyland also randomly selected 11 bundles from which to obtain samples of the marijuana. With respect to each of these 11 bundles, the agent sliced a hole in the contact paper with a knife, removed a handful of marijuana, placed it in a clear plastic bag, and labeled the bag. These 11 samples were retained as evidence and sent to the DEA laboratory for testing. The remainder of the marijuana was loaded onto two pallets, wrapped in plastic shrink wrap, and placed in the DEA drug evidence vault in Albuquerque.

In accordance with the DEA's standard procedure, DEA Agent Terrazas sent a letter to then United States Attorney David Iglesias on August 16, 2006, informing him that the bulk marijuana at issue in this case (*i.e.*, the portion not retained as a representative sample) would be "destroyed after 60 days from the date of this notice unless a written request for an exception to this destruction policy is received by this office prior to the expiration of the 60 day period." [Ex. 1.] Defendant's counsel, Billy Blackburn, entered his appearance on August 15, 2006 [Doc. 6], and Assistant United States Attorney (AUSA) Martinez forwarded the DEA's letter to Defendant's counsel, Mr. Blackburn, on August 17, 2006. Following Defendant's indictment and arraignment [Doc. 12, 16] and the entry of a standard discovery order [Doc. 17], AUSA Martinez sent a follow-up letter to Mr. Blackburn on September 21,

2006, advising him that the wooden crates seized from Defendant's trailer also would be destroyed in mid-October.  [Ex. 8.]

On October 6, 2006, Mr. Blackburn sent a letter to the DEA, as well as AUSA Martinez, acknowledging receipt of a copy of the DEA's destruction notice.  In that letter, Mr. Blackburn objected to the marijuana's destruction and requested "an opportunity to inspect, view, and photograph any and all of the seized contraband and wooden boxes/crates or any other evidence as it relates to this matter." [Doc. 35-2.]  On the same date, Mr. Blackburn and Agent Terrazas exchanged telephone messages, in which the agent informed Mr. Blackburn that the marijuana would be destroyed absent a court order.

In a subsequent letter to AUSA Martinez dated October 12, 2006, Mr. Blackburn acknowledged having a conversation with DEA Agent Bill Terrazas in which Agent Terrazas notified him that "the marijuana would be destroyed unless we sought and received a Court Order."  Instead of immediately moving for a court order, however, Mr. Blackburn sent his letter to AUSA Martinez and asked Mr. Martinez to send a letter to the DEA "requesting that this evidence be held until matters can be adequately resolved in a Court of law." [Doc. 35-3.]

AUSA Martinez responded in a letter to Mr. Blackburn dated October 18, 2006.  In that letter, AUSA Martinez stated that "the Government disagrees with your objection because the request goes beyond established DEA policy and would greatly burden Government resources if every future DEA tractor/trailer case has to deal with similar evidence in the same manner.  Consequently, the Government asks that you seek a Court

order to preserve the evidence which you dispute." [Doc. 42-10.] Per the October 18 letter, AUSA Martinez and the DEA agents also made arrangements for Mr. Blackburn to view the evidence prior to its destruction, and Mr. Blackburn did so at the Albuquerque DEA office on October 26, 2006. At that time, he advised Agent Hyland that he would be filing a motion to preserve the marijuana evidence.

Mr. Blackburn also informed AUSA Martinez that he would be filing a motion to preserve the marijuana evidence in a letter dated October 19, 2006. [Doc. 35-4] Nevertheless, Mr. Blackburn then waited almost a month, until Friday, November 17, 2006, to actually file his motion. [Doc. 35-1.] By that time, Agent Hyland had already filled out the paperwork to start the process of sending the bulk marijuana to a DEA burn site in Tucson, Arizona for destruction.

Defendant's *Motion to Preserve Evidence* filed on November 17, 2006, is a blanket request "including, but not limited to, any and all of the alleged marijuana bundles, any items seized from [Defendant's] person . . . or from the tractor/trailer [Defendant] was allegedly driving the night of August 9, 2006." [Doc. 24.] As grounds for this request, the motion states that the allegedly "short time frame within which [Defendant] has been allowed for review of discovery and investigation of the facts and circumstances of this case has not been adequate to develop a theory" regarding the usefulness of the marijuana. Nevertheless, Defendant's counsel "contemplate[d] hiring experts to examine the bundles as wrapped and determine the possibilities of fingerprint, DNA or other scientific analysis," such as

"scientific odor analysis which quantifies the intensity of odors as sensed by the human olfactory." [Doc. 24, at 6-7.]

Recognizing the time-sensitive nature of Defendant's motion, the Court filed an *Order* [Doc. 26] on November 21, 2006, directing the Government to file an expedited response on or before November 29, 2006.  AUSA Martinez claims that due to the press of other business and his absence during the Thanksgiving holiday, he was unaware of Defendant's motion or the Court's order until he returned to work on Monday, November 27, 2006.  At 11:10 a.m. that morning, AUSA Martinez sent an email to Agent Hyland inquiring about the status of the marijuana, but Agent Hyland did not receive it on that date because he was on leave.  At 10:31 a.m. the following day, Agent Hyland responded by notifying AUSA Martinez that the marijuana was already at the burn site and was not going to be preserved. [Doc. 42-9.]

On the court-imposed deadline of November 29, 2006, the Government filed a response to Defendant's motion stating that except for the 11 samples noted above, the marijuana seized from Defendant's trailer on August 9, 2006, was destroyed on November 28, 2006.  [Doc. 28.]   At the hearing on May 2, 2007, Agent Hyland and his supervisor, Agent Terrazas, claimed not to know that a motion to preserve the evidence had been filed at the time the marijuana was destroyed on November 28, 2006.  They also claimed that it would have been impossible for them to retrieve and identify the marijuana seized in this case once it was removed from the evidence vault in Albuquerque and loaded onto the truck for purposes of transporting it to the burn site.  I do not find these claims to be credible.

While Agent Hyland opined that the marijuana evidence and its odor could change over time as the plant material dried out or decomposed, there is no credible evidence in the record as to the actual extent of any such decomposition or drying at the time the marijuana evidence was shipped to the burn site for destruction.  There is also no evidence in the record of the extent to which the marijuana's packaging material served to preserve its condition or its characteristic odor over the course of time.

On December 15, 2006, Defendant filed a reply brief acknowledging that his motion to preserve evidence was rendered moot, in part, by the destruction of the marijuana.  [Doc. 29.]  Two months later, however, he filed a *Motion to Dismiss, and/or, in the Alternative, Motion to Suppress* [Doc. 35] on the grounds that the Government violated his right to due process by destroying the marijuana evidence.  The latter motion is again lacking in specific information about the destroyed marijuana's potential usefulness to the defense; however, it generally alleges that "there is a question of knowledge of marijuana on the part of a defendant, specifically a dispute over whether the marijuana emitted an odor from the boxes it was housed in."  [Doc. 35, at 10.]

In a subsequent reply brief filed on March 19, 2007, Defendant for the first time identified a potential expert witness who might be able to testify about how the marijuana, if preserved, could have been used to test the hypothesis that its odor could not be detected by the human sense of smell while the marijuana bundles remained enclosed in the sealed wooden crates with the tops screwed down.  [Doc. 47.]  The Government served a subpoena on that proposed expert, Don Wright, to compel his appearance at the evidentiary hearing

-7-

on May 2, 2007.  Defendant initially moved to quash that subpoena.  [Doc. 63.]  Due to the

witness' family medical emergency, however, all counsel agreed that Mr. Wright's subpoena

would be modified to allow him to appear and testify at a later date.  [Doc. 64, 65.]

In the affidavit attached to Defendant's reply brief, Mr. Wright opines that:

had the evidence been retained, an appropriate scientific experiment could
have been designed and executed to address (1) the packaged marijuana leaf
odor character and recognizability; (2) the relative abilities of the individuals
involved to detect this characteristic odor; and (3) the relative abilities of the
individuals to discriminate this characteristic odor from the competing
background odors from the environment and history associated with the
specific cargo load in question.

. . . .

An appropriate scientific experiment could have utilized a routine odor
investigational approach to examine (1) the odor profile and odorant priorities
for the packaged marijuana leaf itself; (2) the odor profile and odorant
priorities for the wooden crates; (3) the odor profile and odorant properties for
the combined trailer environment; (4) the odor threshold  limits for the
involved individuals utilizing individual priority odorants emerging from the
odor profile studies; and (5) an in-situ odor recognition study utilizing an
appropriate representative population of trained sensory panelists.

[Ex. BB to Doc. 47-3.]  According to Mr. Wright's affidavit, "[e]xploring the question of the

odor of the raw marijuana leaf and the relative ability of individuals to discriminate said odor

from the complex competing background specific to the trailer and cargo is dependent upon

duplicating the odor blend at the time of the incident as closely as possible."  [Ex. BB to

Doc. 47-3.]

At the hearing on August 1, 2007, counsel for the Government questioned Mr. Wright

as to what he meant by "duplicating the odor blend at the time of the incident as closely as

possible." Among other things, Mr. Wright admitted during his testimony that the odor of the raw marijuana, as well as other competing odors within the trailer, such as the wooden crates and residual odors from prior cargo, could be subject to change over time. Mr. Wright also admitted that there were other variables, such as temperature, location, and wind speed, that could affect the reliability of the odor identification techniques he discussed. Nevertheless, he opined that if the marijuana evidence had been preserved, the type of odor analysis he contemplated could still be meaningful and relevant even if it was not possible to duplicate the conditions of the incident so precisely that all variables are accounted for. [Tr. 8-1-07.]

Mr. Wright is not a forensic scientist and has not performed any past work targeting the odor of marijuana. Indeed, Mr. Wright admitted at the hearing that he was personally unfamiliar with the odor of raw marijuana and had to ask a colleague to describe it to him. On the other hand, Mr. Wright testified that it is not uncommon in his line of work to be asked to identify and locate the source of a novel or previously unknown odor.

At the hearing on August 1, 2007, defense counsel further clarified that it was not his intent to offer Mr. Wright as an expert witness at trial pursuant to Fed. R. Evid. 702. Rather, Mr. Wright's affidavit and testimony were offered for the purpose of showing the *potential* usefulness of the destroyed evidence in the context of his motion to dismiss the indictment on due process grounds. According to defense counsel, the Government's destruction of the marijuana evidence not only precludes him from presenting an odor defense at trial, it also precludes him from demonstrating the admissibility of an odor expert's testimony at a

<u>Daubert</u> hearing.  Without the marijuana evidence needed to actually perform the type of odor analysis articulated by Mr. Wright, Defendant contends that he has no way of showing that the scientific methods identified by Mr. Wright actually were applied to this evidence in a reliable and relevant manner as required by Fed. R. Evid. 702.

## II.   <u>LEGAL ANALYSIS AND CONCLUSIONS OF LAW</u>

The extent to which the Due Process Clause of the Fourteenth Amendment requires the Government to preserve evidence for use by the Defendant depends on the degree to which the exculpatory significance of that evidence is apparent before its destruction.  <u>See</u> <u>United States v. Bohl</u>, 25 F.3d 904, 910 (10th Cir. 1994).  To invoke the protections of the Due Process Clause for purposes of dismissing an indictment or suppressing evidence in this context, the Defendant must first show, at a minimum, that the destroyed evidence was "potentially useful" to his defense, *i.e.*, "that it could have been subjected to tests, the results of which *might* have exonerated" him.  <u>Arizona v. Youngblood</u>, 488 U.S. 51, 57-58 (1988); <u>accord</u> <u>Bohl</u>, 25 F.3d at 910-11.

In this case, Defendant's motion to preserve the marijuana evidence, as well as the letters which preceded them, are somewhat vague and conclusory as to the potential usefulness of the bulk marijuana that the Government destroyed.  Defendant does not challenge the Government's calculation of the marijuana's total weight, and representative samples were retained in the event there is any challenge to the DEA laboratory's analysis of their content.  In addition, the Government has produced no fingerprint evidence or other biometric information linking Defendant to the crates or marijuana bundles, so it is not

necessary for Defendant to rebut such evidence with an independent fingerprint analysis of his own.

The only specific reason Defendant has identified for preserving the bulk marijuana is to test whether it emitted an odor that human beings were capable of identifying with their own sense of smell before the officers unscrewed and opened the crates inside the trailer at the port of entry.  And it was not until Defendant filed his reply brief regarding his motion to dismiss on March 19, 2007, that he first identified and presented an affidavit from a proposed expert witness, Don Wright, in an attempt to show how such a test might be formulated.

It is apparent from Mr. Wright's affidavit and testimony that testing the odor of bulk marijuana presents a more novel scientific or technical challenge than the serological or DNA testing of clothing samples at issue in Youngblood, 488 U.S. at 335, or the metallurgical testing of steel tower legs at issue in Bohl, 25 F.3d at 911.  Unlike testing the chemical composition of a steel tower leg, there is no viable way of collecting and preserving samples of the odors present at the time of the trailer inspection in this case for later use by an expert witness.  Even if the Government had preserved all sources of physical evidence from which the odor arose (or which may have masked the odor), significant questions remain as to the potential for reliably recreating the exact odor conditions present at the time of the trailer inspection, because there are so many variables which may affect the relevant

-11-

odor characteristics over the course of time.[2]  For these reasons, both a reviewing court and any expert retained by a defendant cannot avoid consideration of the testimony of witnesses present at the scene, and the credibility of such testimony is for the factfinder to determine, not an expert witness.  See United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001).

Insofar as there remain significant questions about the reliability of Defendant's proposed expert testimony on the odor characteristics of the destroyed marijuana, the potential usefulness of the destroyed evidence in this case is not as readily apparent as it was in Bohl, 25 F.3d at 910.  Therefore, I find that Defendant has not made as strong a showing as the Bohl defendants with respect to the first prong of the Youngblood test.  Nevertheless, because the Youngblood test is concerned with the *potential* usefulness of the destroyed evidence rather than its *actual* exculpatory value to the defense, I conclude that the relatively low potential usefulness of the destroyed marijuana in this case does not preclude consideration of the second prong of that test, *i.e.*, whether the Government acted in bad faith by destroying the bulk marijuana after collecting representative samples, allowing Defendant's counsel to inspect it, and concluding that there was no identifiable fingerprint evidence on the marijuana's packaging.

---

[2]As noted above, Defendant is not seeking to admit Mr. Wright's testimony at trial, and therefore  a Daubert hearing, as requested in the Government's motion [Doc. 58] filed on April 23, 2007, is not necessary at this time.

The Tenth Circuit has stated that "the defendant has the burden of proving the bad faith of the government in destroying the evidence" in this context.  Bohl, 25 F.3d at 913 (citing United States v. Donaldson, 915 F.2d 612, 614 (10th Cir. 1990)).  Although the question of bad faith ultimately boils down to "the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed,'" id. (quoting Youngblood, 488 U.S. at 57 n.*), the following six factors are also relevant to answering this question:  (1) whether the Government was explicitly placed on notice that the Defendant believed the evidence in question was potentially exculpatory, (2) whether the Defendant's assertion that the evidence in question "possessed potentially exculpatory value was not merely conclusory, but instead was backed up with objective, independent evidence giving the government reason to believe that further tests . . . might lead to exculpatory evidence," (3) whether the Government still had possession or the ability to control the disposition of the [evidence] at the time it received notice" from the Defendant about its potential exculpatory value, (4) whether the evidence in question was central to the Government's case-in-chief at trial, (5) whether the Government "offers no [innocent] explanation for its failure to preserve" the evidence in question, and (6) whether "the destruction of evidence results from a standard procedure employed by the governmental department or agency regarding the disposal of like evidence." Id. at 911-13.

In this case, Defendant's counsel repeatedly put the Government on notice that he believed the evidence in question to have some potentially exculpatory value.  Further, at the time of the marijuana's destruction, the Government still had the ability to control the

disposition of that evidence and was under a court order to respond to Defendant's motion. Accordingly, the first and third of the factors enumerated above weigh strongly in Defendant's favor.

The sixth of these factors also weighs in Defendant's favor, albeit less heavily than the first and third factors. While there is "no statutory or regulatory requirement . . . that defendants or potential defendants, against whom the soon-to-be-destroyed evidence is to be used, be given notice of its destruction," United States v. Gomez, 191 F.3d 1214, 1219 (10th Cir. 1999), here two DEA agents testified and presented evidence that the DEA has a standard written procedure for determining when to impose a stay on their plans to destroy bulk marijuana that is in their custody. And while the applicable regulations generally grant considerable discretion to the DEA Special Agent in Charge in determining when to destroy bulk marijuana (unless an administrative appeal to the Assistant Attorney General of the Criminal Division is pending), see 21 U.S.C. § 881(f)(2); 28 C.F.R. § 50.21(f), in this case the DEA Special Agent in Charge has exercised that discretion by permitting his agents to follow a policy of staying the destruction of such evidence when a motion to preserve it is pending in a court proceeding or when a court has issued an order regarding such motion.

In this regard, both DEA agents testified that they would have preserved the marijuana evidence in this case had they received earlier notice of the filing of the Defendant's motion or the Court's order directing the Government to file an expedited response. In addition, Defendant points out that there has been at least one other recent case in this district where a court ordered the preservation of bulk marijuana evidence in the DEA's custody, albeit

-14-

temporarily, while a motion was pending.  See United States v. Variste, No. CR 06-1349 BB

(D.N.M. motion filed Oct. 2, 2006).[3]  Thus, the DEA's standard procedure in this case would

have called for the agency to preserve the bulk marijuana upon receiving notice that a motion

had been filed to preserve it in a court proceeding, at least pending compliance with the

Court's order directing an expedited response.

The Government was not acting according to standard procedures when it failed to

promptly take notice of the filing of Defendant's *Motion to Preserve Evidence* [Doc. 24] on

November 17, 2006, or the Court's *Order* [Doc.  26] directing the Government to file an

expedited response to that motion.  Such standard procedures were not followed while

AUSA Martinez was on leave or attending to other matters during the week of Thanksgiving,

nor were they followed when Agent Hyland was on leave the following Monday.

When an attorney or agent is unable to monitor court filings or interoffice

communications because he or she is on leave or out of office, the standard procedure that

the Court expects the United States Attorney's Office to follow is to arrange for a supervisor

or co-worker to watch for and respond to time-sensitive filings or communications in his or

---

[3]Unlike Defendant's motion in this case, the prior motion in Variste only requested preservation of three bundles of marijuana (less than one percent of the total).  Judge Black temporarily ordered the evidence preserved on condition that the defendants "name an expert and file the expert's report as to why preservation of the marijuana is necessary" within a specific time limit.  [No. 06-1349, Doc. 58.]  The defendants in Variste never named an expert or filed an expert report before that time limit expired; however, the preservation issue became moot because Judge Black later granted the Variste defendants' motion to suppress based on his finding that some of the officers' testimony in that case was not credible.  [No. 06-1349, Doc. 91.]

her absence (as when Mr. Blackburn used his associate, Mr. Linnenburger, to handle certain calls).  This procedure applies by virtue of an attorney's role as an officer of the Court and the duties imposed by the Rules of Professional Conduct and Local Rules of this Court, regardless of any other internal procedures that apply within the Executive Branch.

Of course, the Government's failure to follow its own standard procedures or take notice of the time-sensitive court filings in this case does not end the Court's due-process inquiry, because "mere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith."  Bohl, 25 F.3d at 912.  Similarly, "the mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith."  United States v. Richard, 969 F.2d 849, 853-54 (10th Cir. 1992).

Thus, for example, the Tenth Circuit has rejected a bad-faith claim even where the Government destroyed the marijuana in question *after* a district court *granted* a defense motion for an independent analysis and weighing of that marijuana.  See Donaldson, 915 F.2d at 614.  The Donaldson court emphasized that it is the *defendant's* burden to prove bad faith in this context, and this burden is not met where the record is silent as to the reasons for the marijuana's destruction, even in the face of a court order.

Further, this case is not one where the Government has entirely failed to offer any innocent explanation for the marijuana's destruction on November 28, 2006.  While the Government's explanation in this case may depend in part on the negligence of its agents or counsel in failing to promptly take notice of Defendant's motion and the Court's order, the

Government also points to the comparative negligence of Defendant in waiting so long to file his motion after both the DEA agents and AUSA Martinez had repeatedly advised his counsel of the need to secure a court order.

As noted above, there is no question that defense counsel notified the Government of his request to preserve the marijuana.  But it is equally true that the Government repeatedly notified Defendant's counsel that it would *not* preserve the marijuana absent a court order. The Government provided such notice in its October 12, 2006, response to defense counsel's earlier communications, and Defendant's counsel also knew that, pursuant to the earlier "destruction notice," the 60-day retention period was set to expire on or about October 17, 2006.

Thus, Defendant's counsel was fully on notice that the only way for him to preserve the evidence was by means of a court order which required that he file a motion before the expiration of the 60-day period listed in the "destruction notice."  Yet, he waited to file his motion to preserve the evidence until a month later, on November 17, 2006, after Agent Hyland had already completed the paperwork to set in motion the process of shipping the bulk marijuana to the burn site.

Another factor that weighs in the Government's favor is the extent to which the Defendant's assertion that the marijuana "possessed potentially exculpatory value was . . . merely conclusory" and unsupported by "objective, independent evidence giving the government reason to believe that further tests . . . might lead to exculpatory evidence." Bohl, 25 F.3d at 911-13.  This factor requires the Court to consider not only whether the

Government had notice of Defendant's *belief* that the evidence in question had potentially exculpatory value, but also whether Defendant provided the Government with any *objective, independent basis* on which to support that belief *before* the evidence was destroyed.

Defendant's initial communications with the Government and the Court prior to the marijuana's destruction contain only conclusory assertions that the evidence in question possessed potentially exculpatory value; they were not "backed up with objective, independent evidence" which would have imputed knowledge of such exculpatory value to the Government during the time period before this evidence was destroyed.  Id. at 913.  To this day, there has been no showing that the load of marijuana found in the trailer would have retained the same odor or other characteristics over a prolonged period of more than 90 days during which the Government's agents and officers unloaded it from its original packaging and stored it in one or more different locations.  See Richard, 969 F.2d at 853 n.2 (noting that potential exculpatory value of marijuana is speculative given changes in condition of marijuana over time); Donaldson, 915 F.2d at 613 (noting testimony regarding changes in marijuana's weight due to loss of moisture content over time).

Further, at the time the DEA agents destroyed the marijuana, neither the Government nor the Court had the benefit of Defendant's proposed expert testimony, which opines about the possibility of setting up an experiment to recreate the odor (if any) that would have emanated from the marijuana while it remained packaged in the trailer, without predicting the result of that experiment.  Because this proposed expert testimony was not proffered until more than three months *after* the marijuana's destruction, it cannot be used to establish "the

[government's] knowledge of the exculpatory value of the evidence *at the time it was lost or destroyed*.'" Bohl, 25 F.3d at 913 (emphasis added); cf. United States v. Horek, 137 F.3d 1226, 1229 n.3 (10th Cir. 1998) (stating the general rule that courts do not consider arguments or evidence raised for the first time in a reply brief).

The final factor to be considered in analyzing whether the Government destroyed the bulk marijuana in bad faith in this case is whether or to what extent the destroyed marijuana is central to the Government's case-in-chief. See Bohl, 25 F.3d at 912. I therefore consider what role this evidence might play with respect to the Government's task of proving each of the essential elements of the crime charged in the *Indictment* beyond a reasonable doubt.

With respect to the identity and quantity of the controlled substance, the bulk marijuana that was destroyed does not play a central role because the law does not require the Government to introduce the entire load of marijuana into evidence in order to prove these essential elements of its case-in-chief at trial. Rather, the jury is entitled to use "'logical and probabilistic reasoning.'" in order to infer the identity and quantity of the controlled substance as a whole from other evidence (such as representative samples, laboratory analysis, photographs, videotape, and eyewitness testimony). United States v. Atencio, 435 F.3d 1222, 1232 (10th Cir. 2006) (quoting United States v. Arras, 373 F.3d 1071, 1074-75 (10th Cir. 2004)); cf. Donaldson, 915 F.2d at 614 (concluding that a district judge could make inferences about the weight of marijuana for sentencing purposes based on witness testimony when the marijuana itself had been destroyed before the defendants'

-19-

investigators could examine it); <u>Gomez</u>, 191 F.3d at 1219 (finding no due-process violation where the marijuana was destroyed before the defendant was even indicted).

The other essential element of the crime which requires the Court's consideration is whether Defendant knowingly possessed the controlled substance.  With respect to this element, fingerprints or other biometric information linking Defendant to the marijuana or its packaging are not at issue here because the Government admits it has no such evidence. Defendant will be able to point to the absence of such evidence at trial.

Nevertheless, the Government might wish to contend that even if Defendant did not leave fingerprints or other signs of his identity by touching the marijuana or its packaging, he still could have known it was in his possession by means of its distinctive odor.  At the hearing on May 2, 2007, Officer Destea testified that he and another officer could smell marijuana in the trailer before opening the crates, and the Government might attempt to use similar testimony at trial to support the contention that Defendant could have smelled it too. On the other hand, Officer Lucero has testified that he did not smell the odor of marijuana during the initial trailer inspection when the crates remained sealed with their tops screwed down, and Defendant contends that he would have sought to present expert testimony on this issue had the destroyed marijuana been preserved for some type of odor experiment.

Thus, there is a genuine factual dispute about whether human beings could or could not smell the odor of marijuana in the trailer or during the loading of the crates.  Unless the evidence concerning the marijuana's odor is suppressed, this dispute will bear directly on a central, essential element of the Government's case-in-chief at trial.

For purposes of adjudicating Defendant's due-process claim under the particular circumstances of this case, I conclude that the best way to resolve this dispute is to preclude the Government from offering any testimony or evidence in its case-in-chief at trial to suggest that the officers at the scene of the trailer inspection or any other human being could or did smell the odor of marijuana in Defendant's trailer or in proximity to the crates while they remained sealed with their tops screwed down.  With the testimony on this subject suppressed, the destroyed marijuana's odor cannot form a central component of the Government's case-in-chief, and therefore this factor tips the Court's due-process analysis in favor of allowing the Government to proceed to trial without this evidence.

I have taken a similar approach in analyzing Defendant's second motion to suppress the evidence in this case on Fourth Amendment grounds.  As stated in the *Memorandum Opinion and Order* [Doc. 72] filed on June 22, 2007, my decision to deny Defendant's *Second Motion to Suppress* and related motion does not depend on any testimony or evidence about whether the officers could smell the odor of marijuana during the initial trailer inspection, because the officers had probable cause to continue the search and seizure at the port of entry even if no odor of marijuana was present.

Similarly, the suppression of the Government's evidence as to the marijuana's odor does not preclude a jury from finding that Defendant knowingly possessed this controlled substance based on other, circumstantial evidence.  See, e.g., United States v. Baz, 442 F.3d 1269, 1272 (10th Cir. 2006) (concluding that a jury instruction on deliberate ignorance was warranted based on suspicious circumstances where there was no mention of the defendant's

ability to smell the odor of the marijuana he was transporting).  In this regard, I note that the Government already has presented evidence regarding the presence of a false compartment in Defendant's trailer, as well as irregularities in his logbook and bill of lading, which could warrant further inquiry at trial.

Therefore, even if the marijuana had been preserved and Defendant's proposed expert was able to use it to conclusively rebut any testimony suggesting that human beings could smell the odor of marijuana when the crates were sealed with their tops screwed down, the Government would still have sufficient evidence to proceed to trial on each essential element of the offense charged, including Defendant's alleged knowledge that he was in possession of a controlled substance.  Accordingly, I conclude that the appropriate remedy for any bad faith on the part of the Government in destroying the marijuana contrary to standard procedures is to suppress the Government's evidence concerning the marijuana's odor rather than to dismiss the *Indictment*.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court denies Defendant's *Motion to Dismiss* but grants in part the alternative relief requested in his *Motion to Suppress* for the reasons set forth below.  Defendant's *Motion to Preserve Evidence* and *Motion to Quash Subpoena of Don Wright* are denied as moot.

**IT IS, THEREFORE, ORDERED** the *Motion to Dismiss, and/or, in the Alternative, Motion to Suppress* [Doc. 35] is **GRANTED IN PART** with respect to the suppression of

the Government's odor evidence under the conditions specified above, and **DENIED IN PART** insofar as it seeks dismissal of the charges or suppression of other evidence.

**IT IS FURTHER ORDERED** that Defendant's *Motion to Preserve Evidence* [Doc. 24] is **DENIED AS MOOT** in light of the marijuana's destruction on November 28, 2006.

**IT IS FURTHER ORDERED** that Defendant's *Motion to Quash Subpoena of Don Wright* [Doc. 63] is **DENIED AS MOOT** because the subpoena was modified to excuse Mr. Wright's appearance at the hearing on May 2, 2007.

**SO ORDERED** this 17th day of August, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge