# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

  vs.                                      No. CR 06-1833 MCA

**WINGROVE EDWARD MICHAEL**,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Wingrove Edward Michael's *Motion to Exclude Proposed Expert Testimony and/or in the Alternative for Daubert Hearing* [Doc. 86] filed on October 9, 2007, the *United States' Notice of Intention to Offer Expert Testimony* [Doc. 78] filed on August 13, 2007; the *United States' Second Notice of Intention to Offer Expert Testimony* [Doc. 83] filed on September 14, 2007; and the *United States' Third Amended Notice of Intention to Offer Expert Testimony* [Doc. 107] filed on October 31, 2007.  The Court held a hearing regarding these filings in Albuquerque, New Mexico, on November 7, 2007, at which Defendant and counsel were present.  Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being fully advised in the premises, the Court grants in part and denies in part Defendant's motion and sets forth the permissible parameters of the Government's expert testimony below.

## I.      **BACKGROUND**

Defendant Wingrove Edward Michael is charged with a single count of knowingly possessing with intent to distribute more than 100 kilograms of marijuana.  [Doc. 12.]  This charge arises from the Government's seizure of a large load of marijuana from a 53-foot refrigerated trailer following a safety inspection at the Gallup port of entry near New Mexico's western border with Arizona during the early morning hours of August 10, 2006. The details of this seizure, the search that preceded it, and the disposition of the seized evidence are described more fully in the Court's prior rulings [Doc. 72, 79] filed on June 22, 2007, and August 17, 2007.

As part of its case-in-chief at trial, the Government has announced its intention to offer testimony by the following witnesses on the following subjects:  (1) Ramona M. Sanderson offers testimony in the area of forensic chemistry regarding testing and identification of representative samples of the seized marijuana; (2) Joe Mata offers testimony regarding marijuana trafficking practices and procedures, including monetary value, "source cities" and trafficking routes, trafficking profit, use of unknowing couriers, distributable amounts versus personal-use amounts, and "tools of the trade" such as cellular telephones and hidden compartments; (3) James Smid offers testimony regarding commercial trucking practices and procedures, including use of log books and bills of lading, other regulatory requirements, costs and routes of travel, and trailer characteristics such as refrigeration units, hidden compartments, and load types; (4) Thomas Van Valkenburgh offers testimony regarding forensic document examination of Defendant's handwriting

samples in relation to a bill of lading; (5) Ron Quinn offers testimony regarding reassembly and operation of a garage-door opener found in relation to a hidden compartment in the trailer; (6) Bob Godshall offers testimony regarding the location and purpose of Border Patrol checkpoints in the Southwestern United States; and (7) Jeff Jordan offers testimony regarding the practices and procedures employed in shipping goods to the Georgia World Congress Center in Atlanta, Georgia.

Defendant specifically objects, in whole or in part, to the admission of testimony by Joe Mata, James Smid, Ron Quinn, Bob Godshall, and Jeff Jordan.  Except for a generic objection at the beginning of his motion papers pursuant to Fed. R. Crim. P. 16 and Fed. R. Evid. 702, Defendant has identified no substantive grounds for excluding the proposed testimony of the forensic chemist, Ramona Sanderson, or the forensic document examiner, Thomas Van Valkenburgh.

The Court held a hearing on Defendant's objections to the Government's proposed expert testimony on November 7, 2007.  The Court issued separate rulings on the parties' motions in limine and objections to exhibits following the Call of the Calendar on November 8, 2007.

## II.   ANALYSIS

Fed. R. Evid. 702 imposes a special gatekeeping obligation on this Court to ensure that  expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The relevance of such testimony also must be

weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver and Rio Grande Western R. Co., 346 F.3d 987, 991-92 (10th Cir. 2003).  "'Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject.'"  United States v. Muldrow, 19 F.3d 1332, 1338 (10th Cir. 1994).

The purpose of this *Memorandum Opinion and Order* and the hearing which preceded it is to fulfill the Court's gatekeeping function.  The parties should keep in mind, however, that the preliminary rulings stated herein are subject to reconsideration in the event that unforeseen events or a change in context should occur during the trial.  For this reason, the parties are directed to notify the Court outside the presence of the jury before eliciting expert testimony on disputed topics, so that the opposing party has a fair opportunity to renew an objection and the Court may issue a timely ruling on such renewed objections.

## A.   **Proposed Testimony of Joe Mata**

The Government proffers the testimony of Special Agent Joe Mata to explain certain practices and procedures employed in trafficking marijuana which are beyond the common

knowledge of the average juror.  Defendant's objections to the proposed testimony of Agent Mata begin by requesting that the Court preclude Agent Mata from testifying about the portion of the seized marijuana and packaging materials that the Government destroyed after it had weighed, photographed, and collected samples from the entire load.  Defendant contends that the Government's destruction of all but a few small samples of the marijuana and/or packaging material "denied him any hope of challenging the amount of the marijuana seized."  [Doc. 86.]

The effect of the bulk marijuana's destruction on Defendant's constitutional right to due process was previously addressed in the *Memorandum Opinion and Order* [Doc. 79] filed on August 17, 2007.  There the Court noted that the law does not require the Government to introduce the entire load of marijuana into evidence in order to prove the essential elements of its case-in-chief at trial, including the total amount of the marijuana that was seized.  Rather, the jury is entitled to use "'logical and probabilistic reasoning'" in order to infer the identity and quantity of the controlled substance as a whole from other evidence (such as representative samples, laboratory analysis, photographs, videotape, and eyewitness testimony).  United States v. Atencio, 435 F.3d 1222, 1232 (10th Cir. 2006) (quoting United States v. Arras, 373 F.3d 1071, 1074-75 (10th Cir. 2004)).  By the same token, defense counsel is entitled to cross-examine the Government's witnesses, or call other witnesses, in order to point out contrary inferences which might be drawn if there was a failure to verify the contents of each bundle or package found inside the crates before destroying them.

Moreover, as noted in the Court's prior ruling, Defendant's counsel had the opportunity to view the marijuana and request that it be re-weighed before the Government destroyed it.  Neither during his viewing of the marijuana nor in his motion papers or correspondence with the Government regarding the preservation of evidence did Defendant's counsel specifically request that the evidence be re-weighed or that it be preserved for purposes of challenging the Government's calculation of its weight.  Thus, Defendant's due-process challenge does not provide legally sufficient grounds for precluding testimony about the total weight of the seized bundles or their contents.  Rephrasing Defendant's due-process claim as an objection under Fed. R. Evid. 702 does not change that result.

On the other hand, Defendant correctly points out that Agent Mata's proposed testimony regarding marijuana trafficking practices and procedures may not serve as a mere pretext for "'bolster[ing] the credibility of the government's fact-witnesses by mirroring their version of events'" in a narrative statement that stresses "the similarities between the [fact] witnesses' version of events and the expert's description of typical drug transactions." United States v. Tapia-Ortiz, 23 F.3d 738, 740 (2d Cir. 1994) (quoting United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992)); see United States v. Robinson, 978 F.2d 1554, 1563-64 (10th Cir. 1992) (discussing the use of "profile evidence").  As a general matter, expert witnesses may not usurp the jury's factfinding role in determining which version of events is more credible, see United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001), nor may such witnesses usurp the Court's role in instructing the jury on the applicable law, see Specht v. Jensen, 853 F.2d 805, 807-09 (10th Cir. 1988).

Because expert testimony on issues of witness credibility or areas of law covered by the Court's jury instructions is of little or no relevance in this case and raises a substantial danger of unfair prejudice, confusion of the issues, or misleading the jury, see Fed. R. Evid. 403, none of the parties' proposed experts in this case will be permitted to testify as to which version of events set forth by the fact witnesses is more credible, nor will such experts be permitted to define the applicable law for the jury.  In particular, the Court will not permit Agent Mata's trial testimony to take the form of a lengthy narrative statement of a typical marijuana trafficking enterprise followed by an opinion that Defendant's activities in this case fit the pattern or profile of such an enterprise.

Rather, the expert witness must provide "brief, crisp answers to the Government's questions about several discrete topics" which are "beyond the ken of the average juror." Tapia-Ortiz, 23 F.3d at 740-41.  For example, with proper foundation the expert may explain how a particular item of physical evidence is used in the context of a drug-trafficking operation.  See Robinson, 978 F.2d at 1564.  Such explanations may include "[t]estimony about the weight, purity, dosages, and prices" of marijuana, Tapia-Ortiz, 23 F.3d at 740-41, as well as *modus operandi* evidence concerning the work of a drug courier, see United States v. Pineda-Torres, 287 F.3d 860, 864-65 (9th Cir. 2002), and "'tools of the trade'–that is, means for the distribution of illegal drugs," United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991); accord Robinson, 978 F.2d at 1564; United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992).

Defendant objects to Agent Mata's proposed testimony on these specific issues on the grounds that the agent lacks personal knowledge of the total amount of the marijuana seized in this case and the price that such an amount would fetch in Atlanta, Georgia. Under Fed. R. Evid. 703, however, the admissibility of Agent Mata's opinions on these subjects does not depend on whether the underlying facts or data upon which he reasonably relied (*e.g.*, hearsay statements from other law enforcement personnel) are also admissible in evidence. Thus, the fact that Agent Mata reasonably relied on information supplied by other agents to form his opinion about the monetary value of marijuana in Atlanta, Georgia, or to draw the inference that marijuana fetches a higher price in the Southeast than in the Southwest, does not preclude his testimony on these subjects.

Similarly, Agent Mata may reasonably rely on information supplied by other agents in order to form opinions about other characteristics of the marijuana at issue in this case. To the extent that Agent Mata does not have personal knowledge of the weight of the marijuana seized in this case, the bulk marijuana's destruction does not necessarily preclude him from testifying hypothetically as to what the monetary value of the bundles would be in a given market *if* those bundles in fact contained a certain amount of marijuana. In other words, Agent Mata could testify about the monetary value of 1,700 pounds of marijuana, or some other amount, without opining that the marijuana seized in this case actually weighed 1,700 pounds. Even if asked to accept the contrary hypothesis that marijuana was found only in the bundles which the agents actually opened, photographed the contents of, and drew representative samples from, Agent Mata could still testify about the manner in which

marijuana is packaged for distribution and the circumstances under which each bundle or representative sample therefrom could constitute a distributable amount.

Courts have routinely admitted expert testimony on such topics from law enforcement officers with the requisite training and experience. See, e.g., United States v. Wilkerson, 478 F.2d 813, 815 (8th Cir. 1973) (explaining that evidence regarding the resale value of marijuana is relevant to show the defendant's intent and support the inference that the defendant possessed the marijuana with intent to distribute). The principles and methodology used in forming an opinion on monetary value and distributable amounts are relatively straightforward and transparent. In addition, testimony on this subject is helpful to the jury because narcotics trafficking is a specialized activity with which most laypersons would have little or no familiarity. See Muldrow, 19 F.3d at 1338.

Testimony about the value of a particular amount of marijuana, whether that amount is typically held for distribution rather than personal use, and the profits customarily generated from its distribution, is relevant to the Government's task of proving Defendant's knowledge that he was transporting marijuana in the trailer with the intent to distribute it. See United States v. Rodriguez, 192 F.3d 946, 950 (10th Cir. 1999). In particular, these features of the marijuana bear on the plausibility of the Government's theory that Defendant "had knowledge of the presence of the marijuana in the truck that he was driving because no drug smuggler/dealer would place such a valuable load in the truck of an unknowing driver." Id. at 949. With the proper foundation, Agent Mata also may testify about the risks associated with entrusting a valuable and distributable quantity of marijuana to an unknowing

courier.  See, e.g., United States v. Nobles, 69 F.3d 172, 183 (7th Cir. 1995) (concluding that a trial court did not err in admitting testimony that:  "If a courier doesn't know what that person is carrying, he would be–maybe not as cautious or careful as to–their action, and thereby increase the risk for detection," theft, or loss en route).

With proper foundation, the Court also concludes that Agent Mata may testify about whether the tools of the drug-trafficking trade include the use or possession of multiple cell phones by one person.  While it is true that a person's possession of a single cell phone is now so common as to be innocuous, see United States v. Townsend, 305 F.3d 537, 544 (6th Cir. 2002), in this case the Government intends to present evidence that Defendant had several cell phones either on his person or in his tractor-trailer rig.  To the extent that Agent Mata has specialized knowledge about whether or why drug-traffickers use or possess multiple cell phones (rather than a single cell phone) to conduct or conceal their unlawful activities, he may testify on this subject.  See United States v. Slater, 971 F.2d 626, 637 (10th Cir. 1992).

I similarly find that the Government's proposed testimony regarding the use of hidden compartments in trailers as a means or *modus operandi* for distributing marijuana is admissible.  See United States v. Hubbard, 61 F.3d 1261, 1274-75 (7th Cir. 1995); cf. United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004) ("[T]his expert experience conforms with common sense; it is hard to conceive of a legitimate use for a large hidden storage compartment in any vehicle, let alone one [which already has a large] cargo space . . . .").  Defendant contends that the hidden compartment found at the front of the trailer in

this case has no relevance because no marijuana or other contraband was found therein at the time of the Government's search and seizure.  While it is true that the hidden compartment has little or no bearing on the question whether marijuana was actually present in the trailer, the presence of the hidden compartment nevertheless is relevant to show whether Defendant *knew* that he was transporting the marijuana found elsewhere in the trailer.

Of course, none of the Government's experts are permitted to expressly state the final conclusion or inference "as to whether the [D]efendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto."  Fed. R. Evid. 704(b); United States v. Richard, 969 F.2d 849, 852 (10th Cir. 1992). But this rule "does not prevent the expert from testifying to facts or opinions from which *the jury* could conclude or infer the defendant had the requisite mental state," Richard, 969 F.2d at 852-53 (emphasis added), so long as the expert does "not go outside his [or her] specialized knowledge by opining about Defendant's actual intent."  Muldrow, 19 F.3d at 1338.

And where there is no direct evidence of the Defendant's knowledge, the importance and probative value of any circumstantial evidence concerning the state of his knowledge "becomes magnified."  Rodriguez, 192 F.3d at 950.  Such circumstantial evidence may include factors bearing on  whether there was anything unusual about the trailer which would have alerted Defendant to the fact that the trailer was not configured to carry an ordinary or legitimate load.  As both the typical features of a 53-foot refrigerated trailer and the loading practices of marijuana traffickers are likely to be unknown to the average juror, some explanation of these topics from expert witnesses is likely to assist the jury.

It is debatable whether these areas fall within the confines of expert testimony under Fed. R. Civ. P. 702 insofar as the witnesses' opinions are simply drawn from a collection of personal experiences inspecting the contents or design of trailers used in commercial trucking versus marijuana trafficking.  See United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002).  To the extent that such opinions are to be considered expert testimony, they meet the standards articulated in Daubert and its progeny because they follow a simple pattern of inductive reasoning without any logical gaps or unreliable complexities.

A brief explanation of the expert's qualifications and basis of knowledge is necessary to establish the foundation for this line of testimony; however, it is important to distinguish the expert's articulation of the *basis of knowledge* for his or her opinion (namely, past experiences with drug seizures or narcotics investigations) from any inference or insinuation that the Defendant in this case is affiliated with a particular narcotics trafficking organization that the expert has encountered in the past.  While gang-affiliation evidence may be relevant when there is a charge involving a conspiracy, agreement, or other transaction with a second defendant or criminal enterprise, see, e.g., Robinson, 978 F.2d at 1563-65, no such charge is at issue here, and the Government has not shown a relevant and reliable basis for attempting to associate the Defendant in this case with a notorious street gang or criminal organization such as those mentioned in Robinson.  Such an attempt would be unfairly prejudicial under Fed. R. Evid. 403, and the Court will not permit it.  See Pineda-Torres, 287 F.3d at 864-65 (distinguishing "'unknowing drug courier' *modus operandi* testimony," which is admissible, from "testimony of the structure of drug trafficking organizations," which is

not admissible because of its implication "that the defendant was a member of an international drug organization").

The Court also determines that the Government has not shown a reliable basis for its proffered opinions that Defendant's particular route of travel in this case is indicative of marijuana trafficking.  The Tenth Circuit has rejected the notion that a reasonable suspicion of criminal activity can be premised on items or characteristics of travel which are "not merely consistent with innocent conduct but so broad as to provide no reasonable indicium of wrongdoing."  United States v. Guerrero, 472 F.3d 784, 788 (10th Cir. 2007).  "If travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention."  United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005); see United States v. Beck, 140 F.3d 1129, 1138 n.3 (8th Cir. 1998) (collecting cases in which law enforcement has declared nearly every large urban area to be a drug source city).  Agent Mata's testimony at the hearing on November 7, 2007, indicates that the distribution network for marijuana is so extensive that it could involve travel between any number of areas or regions within the United States.  He provides no reliable methodology on which to premise an opinion that interstate-highway travel on a relatively direct route passing through Phoenix, Arizona; Las Vegas, Nevada; and/or Atlanta, Georgia, is more indicative of drug-trafficking activity than any other route of interstate-highway travel between large metropolitan areas.  Therefore, the proposed expert testimony

concerning "drug source cities" in general, or particular routes of interstate-highway travel favored by drug traffickers, is inadmissible in this case.

This ruling does not necessarily preclude the Government's witnesses with the requisite personal knowledge from identifying particular areas of the border with Mexico as frequent sources or pathways for distributable amounts of marijuana. The witnesses' particularized testimony about known activities in a given location is more along the lines of a "statement of fact as to what they had witnessed during the course of their careers." Caballero, 277 F.3d at 1247. Thus, such particularized testimony about a given location's proximity to portions of the border with Mexico has a more reliable basis than generalized assertions about "drug source cities."

Similarly, the Court's exclusion of generalized testimony about "drug source cities" or routes of interstate-highway travel does not necessarily preclude the Government's witnesses from testifying about the discrepancy between Defendant's logbook entries and the receipts indicating he was in Phoenix, Arizona. Evidence showing that Defendant may have attempted to conceal a trip to Phoenix is more probative of his knowledge of illegal activity than a generalized opinion identifying Phoenix as a "drug source city."

**B.    ProposedTestimony of James Smid**

The Government intends to call Officer James Smid to testify about certain practices and procedures commonly found in the commercial-trucking industry which are generally unknown to those outside the industry. In his motion papers, Defendant objects to this proposed testimony on the grounds that: (1) Officer Smid is not qualified to testify regarding

practices and procedures of the commercial trucking industry; (2) Officer Smid is not qualified to testify regarding the practices and procedures of independent contractors within the trucking industry; (3) Officer Smid is not qualified to testify regarding the business or economics of independent truckers (such as whether a given practice is commercially viable); and (4) neither the commercial viability of the practices at issue in this case, nor the specific features of Defendant's trailer (such as the hidden compartment) are relevant to the issues in this case.

As grounds for his assertion that Officer Smid is not qualified, Defendant contends that there was a previous case (for which Defendant's motion provides no citation or transcript) in which Officer Smid allegedly testified that his previous work as a commercial truck driver was only intermittent, and that his subsequent work as a government truck driver was limited to making controlled deliveries of contraband.  In its response, the Government identifies the prior case as United States v. Webb, No. CR 05-176 (D.N.M. judgment entered May 2, 2007), and disputes Defendant's characterization of Officer Smid's testimony and qualifications.  At the hearing on November 7, 2007, Officer Smid testified that his prior work as a commercial truck driver primarily involved hauling heavy equipment on a flatbed trailer in California and Arizona for a single company.

Nevertheless, the Court takes judicial notice of several cases which indicate that, in addition to Officer Smid's prior work as a commercial truck driver, he has worked as a law enforcement officer for the State of New Mexico's Motor Transportation Division for several years.  In that capacity, Officer Smid has obtained certification in conducting all levels of

commercial truck and trailer inspections.  He also has performed numerous commercial truck and trailer inspections (including inspections of rigs owned or operated by independent truckers), and testified about the results of those inspections in federal court.  See, e.g., United States v. Davis, No. CR 04-1211 WJ, Doc. 114 (D.N.M. Oct. 29, 2004) (unpublished memorandum opinion and order denying motion to suppress); United States v. Byrdsong, No. CR 04-1465 JCH, Doc. 21 (D.N.M. Sept. 8, 2004) (exhibits consisting of Officer Smid's certification documents tendered for suppression hearing); id. Doc. 27 (D.N.M. filed Oct. 22, 2004) (unpublished memorandum opinion and order denying motion to suppress).  Thus, Officer Smid's extensive and specialized training and experience as a law enforcement officer tasked with inspecting all varieties of trucks and trucking businesses sufficiently compensates for any deficits in his previous experience as a commercial truck driver.

I find that Officer Smid's training and experience, as a whole, sufficiently qualifies him to provide expert testimony as to the meaning of several items of physical evidence that were seized in this case.  In particular, Officer Smid is qualified to testify about the function that logbooks and bills of lading play in the commercial-trucking industry and in the inspection regime that he is charged with administering or enforcing.  He is also qualified to point out the significance of particular entries on the seized documents by noting, for example, the amounts of driving time or "down time" indicated in the logbooks for a particular time period, whether certain entries match the information listed on receipts, and whether there is an entry to indicate that the load picked up on August 1, 2006, was ever unloaded.  In addition, Officer Smid is qualified to testify about the common features of a

53-foot refrigerated trailer, including the ductwork or ventilation system for refrigeration units, the presence or absence of walled compartments (hidden or otherwise), the manner in which loads are typically configured inside a trailer, the types of loads that typically appear in refrigerated trailers during different times of the year, and the frequency with which such trailers are transported empty or partially empty.

All of these areas present discrete topics about which Officer Smid can provide "brief, crisp answers to the Government's questions" in order to explain the meanings of particular items of physical evidence that are "beyond the ken of the average juror." Tapia-Ortiz, 23 F.3d at 740-41; see Robinson, 978 F.2d at 1564.  Officer Smid has a reliable basis for opining about these topics because they follow a simple, well-established pattern of inductive reasoning from his many personal observations of commercial-trucking practices both as a driver and more particularly as an inspector or law enforcement officer.  As previously noted with respect to the proposed testimony of Agent Mata, the presence of a hidden compartment, as well as other unusual features of the trailer and documents seized in this case, are relevant as circumstantial evidence of Defendant's knowledge that he was carrying contraband rather than a normal or legitimate commercial load.

To the extent that Defendant wishes the jury to draw contrary inferences from other admissible testimony which provides an innocent explanation for his activities, he is free to make that argument.  See Hubbard, 61 F.3d at 1275.  As with any expert opinion, Officer Smid's testimony is not binding, and the jury will be provided with a stock instruction reminding them that they may disregard an expert opinion entirely if they should decide that

it is not based upon sufficient education and experience, or if they should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence.  See id.

In addition, there are two important limitations that must be imposed on Officer Smid's testimony in order to render it admissible under Fed. R. Evid. 702 and 403.  First, while some reference to the regulatory requirements governing the commercial-trucking industry may be unavoidable, Officer Smid may not usurp the Court's role in instructing the jury about the applicable law.  See Specht, 853 F.2d at 807-09.  Thus, to the extent it is necessary to cite a specific regulatory requirement in order to explain or put into context the features of the logbook, bill of lading, or other items seized at the port of entry, it would be preferable for the parties to summarize that requirement and present it in the form of a stipulation or proposed jury instruction which could be read to the jury during Officer Smid's testimony.  This alternative serves to avoid any potential for unfair prejudice or confusion of the issues that might arise if Officer Smid were to present testimony that, in effect, instructs the jury on the applicable law.

Second, I do share some of Defendant's concerns about Officer Smid's proposed testimony regarding the commercial viability of Defendant's trucking operations in this case. While commercial viability is relevant to the issue of Defendant's knowledge and motivation in this case, the Court notes that neither Officer Smid nor any of the Government's other witnesses are credentialed as an economist, business administrator, or tax analyst.  Further, there is a significant gap in the Government's proffer on this topic insofar as Officer Smid

did not review, or base his opinions upon, any concrete data about Defendant's actual reported income (or lack thereof), such as the tax records identified as Government's Exhibits 46, 47, and 48.  The Government has not identified a reliable methodology from which Officer Smid could fill this gap in order to draw conclusions about the particular ratio between costs and revenues that Defendant would need to achieve in order to run a commercially viable trucking business.

For these reasons, I will limit Officer Smid's testimony regarding financial matters to the following discrete topics.  First, he may identify or estimate the particular costs associated with operating a tractor-trailer rig on a cross-country journey, such as the price of fuel and routine vehicle maintenance for an August 2006 trip from Las Vegas, Nevada, to Atlanta, Georgia, using Interstate 40.  Similarly, Officer Smid may estimate the cost of driving Defendant's tractor-trailer rig from Atlanta, Georgia, to Yuma, Arizona, using the route identified in the seized logbook entries.

In addition to providing such cost estimates, I will permit Officer Smid to testify about whether it is common in the trucking industry for the driver or owner of a tractor-trailer rig to bear a financial risk if his or her cargo is damaged, lost, or delayed while in transit.  The officer's testimony on this topic may include common practices that drivers undertake to reduce these financial risks, such as inspecting or counting the cargo as it is loaded or unloaded, verifying the accuracy of bills of lading, and the like.

I will also permit some general testimony about the potential financial impact of "down time" and the frequency with which a tractor-trailer rig typically needs to be kept

loaded and moving in order to generate revenue for its owner or operator.  Along these lines, Officer Smid's testimony may touch upon the potential financial consequences of driving with less than a full load or driving with a non-standard trailer that contains only 51 feet of cargo space instead of the typical 53 feet.

Ultimately, however, it will be left up to the jury to decide whether an imbalance between Defendant's income and costs provided a motive or explanation for him to knowingly transport marijuana with the intention to distribute it.  Officer Smid has not shown the qualifications or reliable methodology that are needed to calculate such an imbalance or draw an ultimate conclusion about the commercial viability of Defendant's trucking business.

### C.      <u>Ron Quinn</u>

The Government proffers the testimony of Ron Quinn, an Electronics Technician employed by the Drug Enforcement Administration (DEA), to explain how the door-opener found in the trailer was reassembled after it was forcibly opened during the search at the port of entry, and to explain how once reassembled, the remote-control device found on Defendant's person and/or in the cab of the tractor-trailer rig serves to open and close the door-opener and thereby control access to the trailer's hidden compartment.  Defendant objects to this proposed testimony on the grounds that it is irrelevant, that the witness is unqualified to offer an expert opinion on the workings of a remote-control operated door-opener, and that the Government has not complied with its discovery obligations with respect to this witness.

I have previously explained that the presence of the hidden compartment in the trailer is relevant to show Defendant's knowledge that the trailer was designed to carry a concealed load, and thereby support the inference that Defendant knew he was transporting a controlled substance such as marijuana.  Evidence that Defendant had a remote-control device on his person or in the cab of his truck, and that one or more of these devices were capable of operating the door-opener used to control access to the hidden compartment, is highly probative of this issue.

At the suppression hearing, other Government witnesses previously testified about how they forced entry into the trailer's hidden compartment during their search at the port of entry without using the remote-control device to open the door to it.  Thus, as a factual matter, it is also relevant for the Government's witnesses to show the condition of the door-opener at the time its relationship to the remote-control device was tested, and what steps, if any, the Government had to take to make each piece of equipment operational.

While most jurors may recognize what a garage-door opener is and what it is designed to do, understanding certain mechanical or electrical details concerning the reassembly and operation of the equipment seized in this case may require an explanation from an expert with specialized knowledge.  Mr. Quinn provided such an explanation and adequately explained his qualifications at the hearing on November 7, 2007.  Defendant also had the opportunity to voir dire the witness and review his resume at the hearing well in advance of trial.  Because I conclude that Mr. Quinn is qualified and has a reliable basis for opining on a relevant topic in this case,  Defendant's objections to his proposed testimony are overruled.

### D.    Bob Godshall

The Government intends to call Special Agent Bob Godshall to testify about the location and purpose of certain Border Patrol checkpoints in the southwestern United States. Insofar as this witness is only called to identify the location of such checkpoints and to briefly explain their purpose (*e.g.*, inspecting passing vehicles for signs that they are transporting contraband or undocumented persons), I conclude that Agent Godshall's testimony does not fall into the category of "expert opinion" governed by Daubert and its progeny.  See Caballero, 277 F.3d at 1247 (concluding that Fed. R. Evid. 702 did not apply to testimony about "relevant, readily-understandable INS procedures or operations" based on "firsthand knowledge").  Agent Godshall may be qualified to testify about the location and purpose of Border Patrol checkpoints based on his personal knowledge alone.

At the Call of the Calendar on November 8, 2007, the Government clarified that Agent Godshall's proposed testimony would be accompanied by maps showing the locations of the Border Patrol checkpoints in relation to various interstate-highway routes.  Although not yet included on the Government's exhibit list on that date, the parties anticipate that such maps will be offered into evidence at trial without objection.

Nevertheless, I conclude that Agent Godshall's proposed testimony in this case is inadmissible because its probative value is so minimal that it is substantially outweighed by the danger of unfair prejudice and confusion of the issues.  As previously noted, the Government has not established a reliable methodology on which to base an opinion that a particular route of interstate-highway travel passing through Phoenix, Arizona; Las Vegas,

Nevada; and/or Atlanta, Georgia, is indicative of marijuana trafficking.  There is also no evidence to show that Defendant would have to take an especially circuitous or improbable route in order to arrive at his Atlanta destination without passing through any of the Border Patrol checkpoints.  In addition, there are any number of plausible reasons for selecting Interstate 40 instead of Interstate 10 as a preferred route of cross-country travel, including the potential for hotter weather and proximity to the Gulf Coast hurricane season along the more southern route.  And regardless of which route Defendant selected, he would still have to pass through the state's ports-of-entry and bear the risk of inspection in that manner.

Accordingly, I conclude that while Agent Godshall may very well be qualified to testify about the locations and purpose of Border Patrol checkpoints, his proposed testimony in this case is of such minimal probative value as to be inadmissible under Fed. R. Evid. 403. The Court's ruling on this issue does not necessarily preclude the admission of the map exhibits discussed at the Call of the Calendar, nor does it preclude evidence that Defendant's logbook entries may have omitted or concealed a trip to Phoenix.

### E.     Jeff Jordan

Jeff Jordan was originally identified as a Custodian of Records for Central Freight Lines, Inc., a business listed on the bill of lading for Defendant's tractor-trailer rig that the officers inspected at the port of entry on or about August 9, 2006.  At the telephonic status conference on Tuesday, October 30, 2007, and in a written notice filed the following day, the Government announced its intention to offer additional testimony from Mr. Jordan regarding his specialized knowledge of the Georgia World Congress Center (identified as the

destination of the cargo listed on Defendant's bill of lading) and the practices and procedures associated with shipping items to that destination. [Doc. 107.] Defendant objects to this proposed testimony.

It appears that a significant portion of Mr. Jordan's proposed testimony is factual in nature and does not fall into the category of "expert opinion" governed by Daubert and its progeny. See Caballero, 277 F.3d at 1247. In particular, I find that Mr. Jordan may testify about what the Georgia World Congress Center is, *i.e.*, a convention center that frequently hosts trade shows, based on his personal knowledge of that facility.

To the extent that Mr. Jordan is going to use his specialized knowledge to opine about common practices and procedures employed in shipping items to the Georgia World Congress Center, his testimony is largely governed by the same considerations that apply to the Government's other trucking expert, Mr. Smid. The fields of information that are typically required to appear on bills of lading for shipments to the Georgia World Congress Center (*e.g.*, booth, delivery time, delivery date), as well as the feasibility and frequency of shipping items to that location for cash on delivery (C.O.D.), present discrete topics about which Mr. Jordan can provide "brief, crisp answers to the Government's questions" in order to explain the meanings of particular items on the bill of lading that are "beyond the ken of the average juror." Tapia-Ortiz, 23 F.3d at 740-41; see Robinson, 978 F.2d at 1564.

Based on the Government's proffer, Mr. Jordan has a reliable basis for opining about these topics insofar as they follow a simple, well-established pattern of inductive reasoning from his many personal observations of commercial-trucking practices at the Georgia World

Congress Center.  As previously noted with respect to other witnesses, the unusual or anomalous features of the shipping documents seized in this case are relevant as circumstantial evidence of Defendant's knowledge that he was carrying contraband rather than a normal or legitimate commercial load.

Therefore, Mr. Jordan's proposed testimony on the discrete topics listed above is admissible under Fed. R. Evid. 702 with the following important caveat:  I will not permit Mr. Jordan to draw an ultimate conclusion as to whether the information on the bill of lading at issue in this case does or does not "make sense."  While Mr. Jordan may point out specific differences or discrepancies between particular fields of information listed on Defendant's bill of lading and the particular fields of information he typically sees on other bills of lading for items destined for the Georgia World Congress Center, the presence of these discrepancies alone does not provide a reliable basis for drawing a more generalized conclusion about the accuracy or authenticity of Defendant's bill of lading as a whole.

On the other hand, the Court has not yet received a proffer concerning the scope of Mr. Jordan's proposed testimony in his capacity as custodian of records for Central Freight Lines.  Thus, at this preliminary juncture, the Court cannot foreclose the possibility that Mr. Jordan's testimony in that capacity may bear on whether Defendant's bill of lading is an authentic record of the Central Freight Lines company.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part Defendant's *Motion to Exclude Proposed Expert Testimony and/or in the Alternative for Daubert Hearing*

[Doc. 86].  The rulings set forth herein are intended to fulfill the Court's gatekeeping obligation under <u>Daubert</u> and its progeny, but are subject to reconsideration in the event that unforeseen circumstances or a change in context should arise at trial.

**IT IS, THEREFORE, ORDERED** that  Defendant's *Motion to Exclude Proposed Expert Testimony and/or in the Alternative for Daubert Hearing* [Doc. 86], as supplemented or clarified at the <u>Daubert</u> hearing on November 7, 2007, is **GRANTED IN PART** and **DENIED IN PART** under the conditions set forth above.

**SO ORDERED** this 15th day of November, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge